420 A.2d 532

**COMMONWEALTH of Pennsylvania,**

v.

**William J. POSAVEK, Appellant.**

Superior Court of Pennsylvania.

Argued June 7, 1979.

Filed May 23, 1980.

266

Richard Haber, Bethlehem, for appellant.

Gerald I. Roth, Allentown, submitted a brief on behalf of Commonwealth, appellee.

Before PRICE, GATES and DOWLING, JJ.*

PRICE, Judge:

On February 11, 1977, following a jury trial, appellant was convicted of conspiracy[1] and theft by deception.[2]  Post–trial

---

* President Judge G. THOMAS GATES of the Court of Common Pleas of Lebanon County, Pennsylvania, and Judge JOHN C. DOWLING of the Court of Common Pleas of Dauphin County, Pennsylvania are sitting by designation.

1.   18 Pa.C.S. § 903.

2.   18 Pa.C.S. § 3922.

motions were denied by the court en banc, as was appellant's petition to reconsider the motions in light of *Commonwealth v. Gallo*, 473 Pa. 186, 373 A.2d 1109 (1977). At the sentencing hearing, appellant presented a motion for new trial based on after–discovered evidence. A hearing was held on February 10, 1978, in which evidence was presented on appellant's petition claiming a juror's violation of his duty to refrain from discussing the case with others. The petition was denied, and on July 19, 1978, appellant was given a suspended sentence and ordered to make restitution in the amount of $4,500. Appellant takes this appeal alleging that the evidence was insufficient to support the conviction for theft by deception and that a new trial is warranted because of the misconduct of a juror. We find no merit in these contentions, and affirm the judgment of sentence.

Initially, we note that in judging the sufficiency of the evidence, we must view the evidence and all inferences arising therefrom in the light most favorable to the verdict winner and determine whether it is sufficient to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Hoskins*, 485 Pa. 542, 403 A.2d 521 (1979); *Commonwealth v. Smith*, 484 Pa. 71, 398 A.2d 948 (1979). Viewed in this fashion, the evidence revealed the following course of events. On January 17, 1976, Michael Bendas responded to this ad which he read in the Allentown Morning Call:

"Fastest growing industry, earn from $15,000 to $50,000 a year. No selling or vending. You get inventory and training. Need $7500.00 to $10,000. Call 691–6188."

His telephone call was answered by the Shop–Rite Construction Company, a home improvement business, and pursuant to their directions, he proceeded to their warehouse and offices in Bethlehem, Pennsylvania.

Nick Hammer met Mr. Bendas at the door of Shop–Rite's building and showed him a partially completed display of fire, burglar and smoke alarms. This was Mr. Bendas' first inkling of the nature of the business in which he was contemplating investment. Mr. Hammer introduced Mr.

Bendas to Charles Vito and appellant, and the four men walked back to appellant's office to talk. Once there, Mr. Hammer attempted to demonstrate how one of the alarms worked but appeared to be entirely unsure of the equipment and to lack any real knowledge about it. As Mr. Vito and Mr. Hammer were called in and out of the office, Mr. Bendas carried on a conversation with appellant during which the latter indicated that he had gone to Chicago to investigate the alarm business and had found that the people in that city were making a lot of money. He discussed with Mr. Bendas the terms of the deal, which were that for $7,500 Mr. Bendas would be provided ten accounts in various establishments, whose owners had agreed to display the alarms, and he would be supplied the display racks and merchandise to put initially in the accounts. Additionally, he was to receive two to three days instruction on the operation and installation of the alarms that he was marketing. Appellant indicated that future purchases of stock would be made at Shop–Rite Construction Company, which would serve as a warehouse, and that he would be available to assist Mr. Bendas.

A few days later, Mr. Bendas returned with his wife and once again spoke to appellant, who clarified the details of the deal. Appellant again informed Mr. and Mrs. Bendas that Shop–Rite would be the main office for the enterprise.

On the strength of these conversations, Mr. Bendas borrowed the necessary money and returned to Shop–Rite on January 30, 1976, to close the deal. He met appellant's brother–in–law and gave him a check in the amount of $7500.00 payable to S.O.S. Securities, as per appellant's request. In April, Mr. Bendas received the promised accounts and merchandise.[3] Late in April, after a number of unreturned phone calls, Mr. Bendas finally was able to contact appellant to complain that his training had not been forthcoming. Appellant told him that he was no longer associated with S.O.S. Security and could not help him. Mr.

3. Testimony showed that Mr. Hammer and appellant had acquired the alarms at a cost of approximately $2,500.

Bendas testified that because of his lack of training he was often unable to answer questions propounded by the proprietors at his locations and was unable to operate the more complex equipment, thus seriously handicapping his ability to maintain his accounts.

The elements of the offense of theft by deception are set forth in 18 Pa.C.S. § 3922 as follows:

"(a) ... A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;

.    .    .    .    .

(b) Exception.-The term 'deceive' does not, however, include falsity as to matters having no pecuniary significance . . .."

Appellant immediately directs our attention to the fact that the check delivered by Mr. Bendas was payable to S.O.S. Security Systems and that the evidence did not establish that he received any of the money paid by the victim to S.O.S. We do not believe that this circumstance demonstrates a fatal deficiency in the Commonwealth's proof. Our Crimes Code defines "obtain" as the act of bringing about a transfer of property to the obtainer *or another*, 18 Pa.C.S. § 3901, clearly contemplating that the accused need not have directly received the property but may consummate the crime by accomplishing delivery to a third party. Furthermore, it is unnecessary that the Commonwealth show that appellant has received a pecuniary gain directly from Mr. Bendas' check. In interpreting the word "obtains" as used in § 836 of the old Penal Code, Act of June 24, 1939, P.L. 872, § 836, *as amended*, Act of May 21, 1943, P.L. 306, § 1, 18 P.S. § 4836 (cheating by fraudulent pretenses), which was a more narrow precursor of the present Crimes Code offense of theft by deception, *Commonwealth v. Gallo*, 236 Pa.Super.

557, 345 A.2d 747 (1975), *rev'd on other grounds*, 473 Pa. 186, 373 A.2d 1109 (1977), this court adopted the view that the language was not to be narrowly restricted and meant *"not so much a defrauding or depriving another of his property, as obtaining some benefit to the party making the false pretenses. . . ." Commonwealth v. Stone*, 187 Pa.Super. 236, 241, 144 A.2d 610, 613 (1958), *aff'd.*, 395 Pa. 583, 150 A.2d 870 (1959) (emphasis in original). Thus, in view of the jury's finding that appellant and Mr. Hammer were involved in a conspiracy together, we find ample evidence suggesting that appellant received some benefit as a result of the deception practiced upon Mr. Bendas.

The main thrust of appellant's argument, however, is that no intent to deceive was established. Appellant focuses on the two primary promises that were not fulfilled—the location of headquarters, or at least a local outlet at Shop—Rite and the provision of training. Regarding the first, appellant contends that the failure to establish a local base was of "no pecuniary significance" and, therefore, fits within the exceptions to the term "deceive" as it is used in the statute, 18 Pa.C.S. § 3922. He argues that Mr. Bendas never had a need for extra inventory and if he had such a need, it was not established that the products would cost more if shipped from Chicago. In effect, appellant claims that the value of this deal was not diminished in any respect by the lack of a local base for the company. We disagree with this analysis.

The commentary to § 223.3 of the Model Penal Code, which provides the basis for § 3922, *see* 18 Pa.C.S. § 3922, Historical Note, makes it clear that misrepresentations of this magnitude were not contemplated by the exception to the statute. Statements are without pecuniary significance only if they do not affect the nature of the property that a party receives. *Commonwealth v. Joy*, 253 Pa.Super. 177, 384 A.2d 1288 (1978). By way of illustration, the comments to the Model Code suggest that a salesman's misrepresentations of his political or fraternal affiliations to effect a sale would be without pecuniary significance because the basic concern of the section is to protect property

interests. Cases like that illustrated, in which the deceived person received everything for which he bargained, would not be covered.

Mr. Bendas, however, did not receive everything for which he bargained. A local base for the company would have provided Mr. Bendas with the service of people knowledgeable about the equipment, the sales territory, and how best to service it. These people would have been immediately available and more directly concerned and responsible for the success of the product in Mr. Bendas' area. It is no defense for appellant to claim that a local outlet was unimportant as a less costly supplier because Mr. Bendas had no need for extra stock. Mr. Bendas' lack of need was, at least in part, due to their failure to fulfill other promises such as to provide training.

Appellant also claims that even if the promises were pecuniarily significant, the mere failure to provide training and to establish a local base, within the words of the statute, does not indicate an intent to deceive. We agree, but find ample support for the jury's verdict in the circumstances of this case other than the fact that the promises were not performed. The trial court may consider words or conduct or attendant circumstances from which the intent to defraud may be inferred. *Commonwealth v. Feldman*, 243 Pa.Super. 408, 365 A.2d 1289 (1976). Mr. Bendas testified that before his payment on January 30, appellant would take his telephone calls and return the call if he were not present. After March and the receipt of the accounts, however, Mr. Bendas was generally unsuccessful at reaching appellant, despite five to ten attempts to telephone him, and for the most part, his calls were not returned. He did succeed in contacting appellant on one occasion when he happened to answer the phone personally, at which point appellant informed him that he was no longer associated with S.O.S. Security. Mr. Bendas also attempted to telephone Mr. Hammer in Chicago, but could only reach his answering service, and although he left messages, Mr. Hammer never contacted him. In June, the number was discon-

nected. In *Commonwealth v. Gallo, supra,* the supreme court found that under the facts there present, the evidence was insufficient to indicate an intent to deceive because the defendant, having given his correct telephone number, too easily could be located, but the facts of the instant case put this information in a different posture and do indicate evasion. Appellant was not concerned about being found because he disclaimed any responsibility for the failure to perform completely and, indeed, disclaimed all connections with the deal, leaving Mr. Bendas to try to obtain satisfaction from the company. This is unlike the situation in *Gallo* in which the defendant was a one–man operation and had no organization to use in attempting to evade his responsibility.

Another circumstance to be considered is the unexecuted contract supplied to Mr. Bendas. Appellant argues throughout his brief that the contract should be used as evidence of the promises made in this deal. However, the contract was only signed by Mr. Bendas and not by appellant or anyone from the company so that the latter would not be bound by its terms. This also evidences a lack of intent to perform the promises.

Furthermore, Mr. Bendas was supplied with merchandise of an inferior quality. He testified that the display racks provided for the merchandise, although attractive, did not operate as intended. Buttons on them that were supposed to demonstrate the equipment did not function. Some of the packaging of the alarms was also damaged so that the alarms could not be displayed. Appellant promised that Mr. Bendas would receive credit for these, but this credit was never forthcoming. We find that the cumulation of all these circumstances is sufficient to support a finding that appellant had the requisite intent to deceive.

Proceeding to appellant's second contention concerning the misconduct of one of the jurors, we find the following facts were brought forth at a hearing on the motion for new trial. Rose Peters was a close friend of her landlord John

Vito, brother of Charles Vito, a co–defendant in this trial.[4] During the course of the trial, Ms. Peters used the telephone at the Vito's residence to speak to her brother, the juror in question. She testified in these words to the substance of this conversation;

> "Well, I wouldn't really consider it conversations. I mean I asked him if, you know, if the case had to do with, you know, Charles Vito's case. And that is about all he really knew at the time, you know, he said yeah, it was his case and, what the heck, then he said, you know, the other two guys that were involved. But that is about all he said. He says he really doesn't know any more and its going to be in the papers anyways." (N.T. at 225c).

John and Ruth Vito testified that after this conversation, Ms. Peters conveyed to them her brother's statement to the effect that the defendants looked like "shysters" and "were as guilty as sin." (N.T. at 241c). Appellant contends that this evidence shows the juror violated the trial judge's instructions to refrain from discussing the case with anyone prior to deliberations, and that it indicates that the juror had predetermined appellant's guilt solely by his appearance, rendering the verdict unjust. We disagree.

The refusal of a new trial on grounds of alleged misconduct of a juror is largely within the discretion of the trial judge. *Commonwealth v. Grant,* 121 Pa.Super. 399, 183 A. 663 (1936). When the facts surrounding the possible misconduct are in dispute, the trial judge should examine the various witnesses on the question, and his findings of fact will be sustained unless there is an abuse of discretion. *Commonwealth v. Thompson,* 328 Pa. 27, 195 A. 115 (1937); *Commonwealth v. Edwards,* 318 Pa. 1, 178 A. 20 (1935). The trial judge in the present case found that the juror did not made the statements attributed to him by the Vitos. He carefully examined Ms. Peters' interest in protecting her brother, but noted that the Vitos' credibility was called into

---

**4.** Charles Vito's convictions of conspiracy and theft by deception were set aside when the court of common pleas en banc determined that the trial judge should have sustained his demurrer to the evidence at the close of the prosecutor's case.

question by their failure to come forth with this information of prejudgment while Charles Vito, the brother, was still on trial facing possible conviction. We see no reason to disturb this finding because the credibility of these witnesses was for the trier of fact, the trial judge, to determine.

We agree with appellant that it is the duty of the jury to avoid all conduct that would bring the administration of justice into dispute and to find the facts in accordance with the evidence presented, free of bias and prejudgment. *Hostetler v. Kniseley*, 322 Pa. 248, 185 A. 300 (1936); *Commonwealth v. Hurd*, 177 Pa. 481, 35 A. 682 (1896). The testimony of Ms. Peters that her brother told her to read the newspaper to find out about the trial, however, fully justifies the conclusion that the juror properly discharged his duty and did not discuss or prejudge the events of the trial.

We affirm the judgment of sentence.