483 A.2d 933

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Victor M. SNYDER, Steven Clampers, Michael Marino, Vic Snyder, Inc.**

Superior Court of Pennsylvania.

Submitted May 4, 1984.

Filed Oct. 26, 1984.

20

22

Sandra L. Elias, Deputy District Attorney, Media, for Commonwealth, appellant.

Joseph M. Fioravanti, Media, for Snyder, etc., appellees.

Frank J. Marcone, Media, for Clampers, appellee.

Before CIRILLO, DEL SOLE and POPOVICH, JJ.

PER CURIAM:

A grand jury investigation into the business practices of the plumbing concern Vic Snyder, Incorporated, led to the filing of criminal charges against the corporation and several of its employees. The defendants were charged with theft by deception, deceptive business practices, and conspiracy.

After preliminary hearings, appellee Vic Snyder, Inc. was held for trial on four counts of each offense under the corporate liability provisions of the Crimes Code, 18 Pa.C.S. § 307(a); appellee Vic Snyder, owner and president of the corporation, was held on two counts of each offense; appellee Michael Marino on one count of each; and appellee Steven Clampers one count of each.

Appellees petitioned for writs of habeas corpus in the Court of Common Pleas of Delaware County. After reviewing the preliminary hearing records, the court granted the requested relief as to all counts against the corporation, Snyder, and Marino, and as to the conspiracy count against Clampers. The Commonwealth appeals the grants of habeas corpus relief, having admitted it would have no additional evidence to present against the defendants were rehearings to be granted.

The question for determination by this Court, following a review of the record from the court below, is to determine whether the evidence received at the preliminary hearing presented sufficient probable cause to believe that the appellees committed the offenses for which they are charged. The quantity and quality of evidence presented there "should be such that if presented at trial in court, and accepted as true, the judge wold be warranted in allowing the case to go to the jury." *Commonwealth ex rel. Scolio v. Hess*, 149 Pa.Super. 371, 27 A.2d 705 (1942). The Commonwealth's burden at a preliminary hearing is to establish at least prima facie that a crime has been committed and that the accused is the one who committed it. *Commonwealth v. Mullen*, 460 Pa. 336, 333 A.2d 755 (1975). This means that at a preliminary hearing, the Commonwealth must show the presence of every element necessary to constitute each offense charged and the defendant's complicity in each offense. Proof beyond a reasonable doubt is not required, nor is the criterion to show that proof beyond a reasonable doubt is possible if the matter is returned for trial. However, proof, which would justify a trial judge submitting the case to the jury at the trial of the case, is required. Inferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, *Commonwealth v. Rodgers*, 235 Pa.Super. 106, 340 A.2d 550 (1975), and the evidence must be read in the light most favorable to the Commonwealth's case. *Commonwealth v. Zeringo*, 214 Pa.Super. 300, 257 A.2d 692 (1969). Prosecutorial suspicion and conjecture are not evidence and are unacceptable as evidence.

Our function is to take the facts proven by the Commonwealth at the preliminary hearing and to determine whether the sum of those facts fits within the statutory definition of the types of conduct declared by the Pennsylvania legislature in the Crimes Code to be illegal conduct. If the proven facts fit the definition of the offenses with which the appellees are charged, then a

prima facie case was made out as to such offense or offenses. If the facts do not fit the statutory definitions of the offenses charged against the appellees, then the appellees are entitled to be discharged.

*Commonwealth v. Lynch,* 270 Pa.Super. 554, 581–82, 411 A.2d 1224, 1238–39 (1979), *modified in Commonwealth v. Wojdak,* 502 Pa. 359, 466 A.2d 991 (1983). *Accord, Commonwealth v. Gray,* 322 Pa.Super. 37, 469 A.2d 169 (1983); *Commonwealth v. Rick,* 244 Pa.Super. 33, 366 A.2d 302 (1976). *See also Commonwealth v. Davis,* 308 Pa.Super. 204, 454 A.2d 92 (1982) (allocatur refused, Feb. 28, 1983).

We turn to an examination of the evidence in this case, which revolves around four separate business transactions between Vic Snyder, Inc. and members of the general public.

## I. Randolph Transaction

In December of 1979, Alphonso Randolph of Parkside, Pa. called Vic Snyder, Inc. to repair a leak in his ceiling. The corporation dispatched salesman Alfred Rossino to the Randolph home. Although Rossino had no plumbing expertise, he represented himself to Randolph as a "master plumber," and told Randolph that, among other things, his "curb trap" needed to be replaced. Randolph entered into a contract under which the work would be done for $1850, to be paid in installments.

The next day, John Sciblo, a subcontractor, and several other workmen began work on the Randolph job. When Sciblo exposed the old curb trap he could see water flowing through it, which indicated that it was functioning properly. He telephoned Vic Snyder, Inc., and informed them that the curb trap was working, but was told by an unidentified person to replace the curb trap anyway.

That evening Rossino returned to have Mr. Randolph complete bank forms in connection with the financing arrangement. Randolph stated that he was dissatisfied because there was still a leak in his ceiling and the price was too high. Randolph indicated that he might not sign the

financing papers. Rossino then told Randolph that the work was not completed and asked what Randolph thought would be a fair price. Randolph responded with the figure of $1000. Rossino, after a telephone call to his "boss," redrafted the contract with a renegotiated price of $1200. The following day workmen from Vic Snyder, Inc. returned to the site and finally remedied the leak.

Subsequently, Detective William Hannum spoke with Rossino about the Randolph job. Rossino recalled the job as the one where he had sold a curb trap the customer didn't need. Rossino also told Hannum that he had picked the contract price "out of the air."

Based on this evidence, the district judge bound the corporate defendant and Vic Snyder individually over for trial. Rossino also was held for trial, but was later discharged based on the running of the statute of limitations. He is not a party to this appeal.

The Commonwealth's theory of the case is that Rossino's actions violated sections 3922 and 4107 of the Crimes Code, relating to theft by deception and deceptive business practices; that Vic Snyder can be held as an accomplice and conspirator to Rossino's actions; and that the corporation can be held vicariously liable for the actions of Snyder as a high managerial agent of the corporation. *See* 18 Pa.C.S. § 307(a)(3), (f).

■ We will accept for the moment that the Commonwealth proved that Rossino, fobbing himself off as a "master plumber," intentionally deceived Randolph into buying an unneeded curb trap and memorialized the sale in a false or misleading written contract, and that this conduct constituted theft by deception and deceptive business practices under the Crimes Code. The Commonwealth's case against Snyder and the corporation, however, necessarily depends upon proof that Snyder was an accomplice or a conspirator to the actions of Rossino alleged to be illegal.

The Crimes Code defines an accomplice as follows:

A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it.

18 Pa.C.S. § 306(c)(1).

The elements of a conspiracy are set out at *id.* § 903(a):

(a) **Definition of conspiracy.**—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

We find an inadequate basis in the Commonwealth's evidence to establish any complicity on the part of Snyder sufficient to hold him as an accomplice or conspirator to Rossino's actions. There is no direct evidence whatsoever of Snyder's involvement in the Randolph deal. The Commonwealth maintains, however, that the circumstantial evidence of two telephone calls placed to Vic Snyder, Inc., sufficiently links Snyder to Rossino's deceptive machinations. The evidence of the first such call showed only that some unidentified person at Vic Snyder, Inc. told Sciblo to replace the curb trap even though it was functioning properly. In the absence of any evidence as to who the person was we cannot infer that it was Snyder. It may just as well have been Rossino. The second call, purportedly from Rossino to his "boss," led to the contract renegotiation. However, once again the identity of the "boss" remained unproven. If Rossino's "boss" was indeed on the other end of the line, and supposing it was Snyder, his apparent

approval of a lowering of the contract price was entirely consistent with the lawful activity of renegotiating a contract with a dissatisfied customer, and provides only the scantest basis to infer that Snyder knew about or sanctioned replacement of the properly functioning curb trap.

In sum, the Commonwealth's evidence against Snyder and the corporation in the Randolph case consisted entirely of speculative inferences, which are insufficient to establish a prima facie case. *Commonwealth v. Prado*, 481 Pa. 485, 393 A.2d 8 (1978). We must uphold the Court of Common Pleas in dismissing the charges against Vic Snyder and the corporate defendant in the Randolph affair.

## II. Davis Transaction

In December of 1981 Eva Davis was experiencing a problem with her backyard patio drain. Raw sewage was backing up out of the drain onto the patio. She called a plumber, who could not unclog the drain. She then called Vic Snyder, Inc., which sent appellee Michael Marino to assess the problem.

Marino told Howard Davis, Eva Davis's son, that a new sewer line from the house to the sewer main was needed. Marino paced off the distance from the house to the street, and determined that fifty feet of cast iron sewer pipe would be needed to complete the job. Marino and Howard then executed a contract for the work to be done for $1500.

With a backhoe, several workmen attempted to locate the Davises' sewer line. After searching for two or three hours, they finally struck the line, which they discovered did not run fifty feet to the sewer main, but instead ran only two or three feet to the neighbor's property line where it connected with a common pipe leading to the sewer main. Consequently, repairing the Davises' pipe required only two to three feet of pipe rather than the fifty feet called for in the contract.

Anthony Tomczak, a plumber on the job, called Vic Snyder, Inc., to inform the office that the contract could not be performed as specified. Marino was sent back to the job

site. Upon arriving and being apprised of the situation, Marino told Tomczak that he (Marino) would have to talk to Snyder, and left to make a phone call. When Marino returned he told Tomczak to connect the Davises' line to the common pipe, but not to tell the Davises about the changed circumstances.

After examining the area of excavation, Howard Davis determined that fifty feet of pipe had not been laid. He later confronted Marino with his discovery and requested a reduction in the contract price. Marino refused to lower the price, justifying his refusal by declaring that labor and equipment costs accounted for most of the contract price.

The district justice found prima facie cases of theft by deception, deceptive business practices, and conspiracy against Marino and the corporation, but dismissed charges against Vic Snyder. Before us is the propriety of the trial court's order overturning the finding of a prima facie case against Marino and the corporation.

■ With regard to the charges of theft by deception and deceptive business practices against Marino, we are constrained to disagree with the court's conclusion that a prima facie case was not shown.

Theft by deception is defined at 18 Pa.C.S. § 3922(a):

(a) **Offense defined.**—A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;

(2) prevents another from acquiring information which would affect his judgment of a transaction; or

(3) fails to correct a false impression which the deceiver previously created or reinforced . . . .

The statute defining deceptive business practices states, in pertinent part:

(a) **Offense defined.**—A person commits a misdemeanor of the second degree if, in the course of business, he:

. . . .

(2) sells, offers or exposes for sale, or delivers less than the represented quantity of any commodity or service;

. . . .

(6) makes a false or misleading written statement for the purpose of obtaining property or credit . . . .

*Id.* § 4107.

It is true, as the trial court noted, that before excavation began Marino was in no better position than the Davises to know that their sewer line did not run all the way to the street. Thus, Marino is not chargeable with intentional deception for originally contracting with the Davises to lay fifty feet of pipe.

However, there is ample evidence that once Marino became aware that the job required only two to three feet of pipe rather than fifty, he actively tried to conceal this information from the Davises. Thus, he instructed Tomczak to go ahead with the work without notifying the Davises of the changed specifications. Only after Howard Davis, acting on his own information, requested a reduction in the contract price due to the discrepancy between the work contracted for and that completed did Marino admit to using less pipe than the contract specified. Only then did Marino attempt to justify his earlier failure to inform the Davises of the changed conditions, by maintaining that labor and equipment costs accounted for the bulk of the contract price anyhow.

The trial court placed great reliance on the factual accuracy of Marino's belated representations to the Davises. Thus, the court accepted as fact that labor and equipment costs were the major components of the contract price, and the cost of the pipe but a "minimal" component. We question the court's reliance on these representations, as there is no substantial evidence in the record that would allow the court with any precision to compare the costs of

30

pipe, labor, and equipment used on the Davis job. More-
over, it stands to reason that had the workmen had to
install fifty feet of pipe rather than three, the task would
have consumed a proportionately greater amount of time,
labor, and equipment.

In our view, Marino's attempt to conceal the changed
conditions from the Davises bespeaks, at least on prima
facie consideration, the dishonesty and deceitful intent nec-
essary to support a conviction for theft by deception. *See
Commonwealth v. Schomaker*, 501 Pa. 404, 461 A.2d 1220
(1983); *Commonwealth v. Posavek*, 278 Pa.Super. 265, 420
A.2d 532 (1980). "Concealment of an act, which, owing to
the circumstances, may or may not be criminal, has always
been regarded as evidence that the act was criminal."
*Buckley v. Massachusetts Bonding & Insurance Co.*, 113
Wash. 13, 26, 192 P. 924, 929 (1920).

Moreover, Marino's attempt at concealment was precip-
itated when plumber Tomczak halted work to inform head-
quarters that the contract could not be performed as speci-
fied. The circumstances surrounding the attempted decep-
tion belie a finding that the difference between the job done
and the job contracted for was inconsequential. The record
on the contrary supports an inference that Marino augment-
ed the payment received from the Davises by falsely repre-
senting to them that they had gotten work of equal value to
that contemplated in the contract.

We hold the evidence sufficient to show prima facie that
Marino committed theft by deception by intentionally foster-
ing a false impression that the work done by his company
was the same in extent or value as that contracted for. *See*
18 Pa.C.S. § 3922(a)(1)–(3). We also find sufficient prima
facie evidence to show that Marino engaged in deceptive
business practices by delivering less than the bargained-for
quantity of goods or services to the Davises, and by repre-
senting in writing that the greater quantity had been pro-
vided. *See id.* § 4107(a)(2), (6).

However, we agree with the trial court that there was not
enough evidence to link Vic Snyder, Incorporated to crimi-

nal activity in the Davis transaction, nor to link Marino with an alleged conspiracy with the corporation.

The Commonwealth's evidence against the corporation, and against Marino on the conspiracy count, consists of the unadorned testimony that Marino telephoned Vic Snyder before acting in regard to the Davis matter. The Commonwealth would have us infer that because Vic Snyder was intimately involved in the day-to-day operations of Vic Snyder, Inc., he must have directed, or at least known about, the deception practiced upon the Davises. The Commonwealth concludes that the corporation may be held vicariously liable for the part of Snyder, its president, in the Davis affair. *See id.* § 307(a)(3).

Suffice it to say that the Commonwealth's evidence implicating Snyder in the Davis transaction rises barely above the level of innuendo, and falls well below the level necessary to prove a prima facie case. *Cf. Commonwealth v. Wojdak*, 502 Pa. 359, 466 A.2d 991 (1983); *Commonwealth v. Daubner*, 288 Pa.Super. 47, 431 A.2d 280 (1981). Therefore, on the Davis matter, we uphold the grants of habeas corpus to the corporation and to Marino on the conspiracy count.

### III. Eckert Transaction

The drain in the kitchen sink of Mr. and Mrs. Ernest H. Eckert of Ardmore had been clogging continually for years. The efforts of two separate plumbers had been ineffectual in fixing the drain. In March of 1982 the Eckerts contacted Vic Snyder, Inc. about the problem. The company sent professional drain cleaner Daniel Hitchner to the Eckert abode, but after an hour and a half of work Hitchner too failed to clear the drain, and recommended that the Eckerts solicit the opinion of a plumbing contractor.

Later, appellee Steven Clampers of Vic Snyder, Inc., visited the Eckert home unsummoned and surveyed the situation. Clampers told the Eckerts that exploratory work would have to be done to locate and examine the kitchen drain pipe, and the parties contracted for Vic Snyder, Inc. to do the job for $650.

In order to find the source of the problem with the drain pipe, workmen had to tear up part of a double-thick concrete floor in the Eckerts' basement. The excavation exposed a ten-foot length of pipe that had disintegrated. Although little more than this ten feet of pipe was visible, Clampers told Mr. Eckert that the pipe was "gone," indicating, according to Eckert's testimony, that the entire length of kitchen drain pipe, some thirty-five feet, was defective and had to be replaced.

Eckert then signed a contract calling for Vic Snyder, Inc., to replace the drain pipe for a fee of $14,250, less a 10% senior citizen's discount (although, as Eckert told Clampers, he was not a senior citizen). Eckert later testified that although he thought the contract price was outrageous, he felt compelled to sign at the time because his kitchen sink was nonfunctional, his basement was all dug up and a terrible stench emanating from it, and he figured that Vic Snyder, Inc. had started the job and had to complete it. A plumbing expert called by the Commonwealth at the preliminary hearing testified to the effect that the price charged Mr. Eckert was well over double the fair price for the job, including profit.

After the rotted section of pipe had been exposed, Daniel Hitchner, the drain cleaner, was called in again to clean out the remainder of the line. He ran a cable through the line and was able to effect a clear passage; in addition, he ran water at high pressure through the line for fifteen minutes without congestion. From this he concluded, as he later testified, that the unexposed portion of the line was in perfect condition.

A few days after Hitchner had cleaned the drain pipe which was to be replaced, he was on the job site at the Eckert home when he was called to the telephone to talk to Vic Snyder. Snyder told Hitchner to do whatever Clampers said with regard to cleaning the drains there. Shortly thereafter, Clampers instructed Hitchner to clean all the drains in the Eckert house to "make the price bigger."

Hitchner left the Eckert job without cleaning all the drains as Clampers had instructed him.

Subsequently, in the course of the investigation into the business practices of Vic Snyder, Inc., Detective William Hannum was told by Vic Snyder that he personally had set the price on the Eckert job. Also during the course of the investigation, Snyder called a meeting for employees who had been involved in the Eckert affair. He contacted Daniel Hitchner about attending the meeting, and asked Hitchner what he was going to say to the investigating authorities. Hitchner replied that he was going to tell the truth, including the fact Clampers had told him to clean all the Eckerts' drains to inflate the price. Snyder then remonstrated Hitchner not to tell the authorities what Clampers had said. Hitchner insisted he would tell the truth and refused to come to the meeting. Later that same day, Snyder telephoned Hitchner, who was on a house call, and fired him.

The district justice found a prima facie case of theft by deception, deceptive business practices, and conspiracy against both Clampers and the corporation in connection with the Eckert job. The trial court granted habeas corpus on all charges against the corporation, and on the conspiracy charge against Clampers.

All counts against the corporation are premised on its vicarious liability for the acts of Vic Snyder. The Crimes Code, at 18 Pa.C.S. § 307(a)(3), provides:

Liability of organizations and certain related persons

(a) **Corporations generally.**—A corporation may be convicted of the commission of an offense if:

. . . .

(3) the commission of the offense was authorized, requested, commanded, performed or recklessly tolerated by the board of directors or by a high managerial agent acting in behalf of the corporation within the scope of his office or employment.

34

Snyder's status as "high managerial agent" of the corporation is undisputed. The Commonwealth's case against the corporation thus depends on a sufficient showing that Snyder "authorized, requested, commanded, performed or *recklessly tolerated*" the commission of theft by deception of deceptive business practices against the Eckerts.

On the conspiracy counts, it was the Commonwealth's burden to establish a collusive agreement to commit the offenses of theft by deception or deceptive business practices. *See* 18 Pa.C.S. 903(a); *Commonwealth v. Olds,* 322 Pa.Super. 442, 469 A.2d 1072 (1983); *Commonwealth v. Graves,* 316 Pa.Super. 484, 463 A.2d 467 (1983). Shared criminal intent is a sine qua non of the crime of conspiracy. *Commonwealth v. Schomaker, supra; Commonwealth v. Horner,* 497 Pa. 565, 442 A.2d 682 (1982); *see also Commonwealth v. Ruffin,* 317 Pa.Super. 126, 463 A.2d 1117 (1983).

Proof of a conspiratorial agreement between Snyder and Clampers to commit the subject offenses necessarily would prove that Snyder at the very least "recklessly tolerated" the offenses. Thus, a finding that there was sufficient proof of a conspiracy would require us to reinstate not only the conspiracy count against Clampers, but also all charges lodged against the corporation on the theory of vicarious liability. The conspiracy alleged in this particular case is one to commit the crimes of theft by deception and deceptive business practices, both of which require a showing of fraudulent intent. *Commonwealth v. Maleno,* 267 Pa.Super. 560, 407 A.2d 51 (1979). We thus examine the words, conduct, and attendant circumstances of the alleged conspirators for evidence of an intent to defraud the Eckerts. *See Commonwealth v. Posavek, supra.*

The acts of Clampers tending to establish his fraudulent intent were that he falsely represented to the Eckerts that their entire kitchen drain was "gone," when in fact only a portion of the line was defective; and that he attempted to pad the contract with make-work (superfluous drain cleaning). The fact finder could infer from these acts

that the Eckerts were intentionally misled as to the necessity, amount, or value of the work they received. *See* 18 Pa.C.S. § 3922(a); *id.* § 4107(a)(2); *Commonwealth v. Joy*, 253 Pa.Super. 177, 384 A.2d 1288 (1978) (false representations as to necessity or value of work done supported conviction for theft by deception). In addition, Clampers's deceptive representations to the Eckerts were memorialized in a written contract, on the basis of which the corporation obtained payment or credit. *See* 18 Pa.C.S. § 4107(a)(6). There was sufficient evidence of Clampers's intent to commit theft by deception and deceptive business practices even though much of the work done for the Eckerts was legitimate and therefore some portion of the payment obtained from them was not based on fraud. *See Commonwealth v. Bentley*, 302 Pa.Super. 264, 448 A.2d 628 (1982).

■ The evidence of Snyder's complicity in the culpable acts of Clampers is entirely circumstantial. Nevertheless, due to the inchoate nature of a conspiracy, direct evidence of an explicit agreement is seldom attainable; thus a conspiracy ordinarily must be inferred from the relation, conduct, and circumstances of the parties, and may be proven by circumstantial evidence alone. *Commonwealth v. Derr*, 501 Pa. 446, 462 A.3d 208 (1983); *Commonwealth v. Kennedy*, 499 Pa. 389, 453 A.3d 927 (1982); *Commonwealth v. Dolfi*, 483 Pa. 266, 396 A.2d 635 (1979); *Commonwealth v. Davis*, 312 Pa.Super. 85, 458 A.2d 248 (1983); *Commonwealth v. Davenport*, 307 Pa.Super. 102, 452 A.2d 1058 (1982); *Commonwealth v. Tumminello*, 292 Pa.Super. 381, 437 A.2d 435 (1981).

■ In the light of these principles, outlines of a conspiratorial agreement between Snyder and Clampers begin to emerge. Snyder set the contract price of $14,250, exorbitant for the work done at the Eckert home. Although the Commonwealth did not allege that it was criminal merely to overcharge the Eckerts, we must consider the fact that the job was overpriced in conjunction with the circumstantial evidence showing Snyder's imprimatur on the very aspects of the transaction as to which Clampers deceived the Ec-

kerts. Snyder, who kept in frequent telephone contact with the job site, on one call specifically ordered a hesitant workman to replace the entire kitchen drain line, N.T. 3/2/83 at 192; on another he told Daniel Hitchner to do whatever Clampers instructed with regard to cleaning the drains, whereupon Clampers instructed Hitchner to run all the drains again to enhance the price, *id.* at 194. Where the conduct of the parties indicates they were acting in concert with a corrupt purpose in view, the existence of a conspiracy may properly be inferred. *Commonwealth v. Esposito*, 236 Pa.Super. 127, 344 A.2d 655 (1975); *Commonwealth v. Schwartz*, 210 Pa.Super. 360, 233 A.2d 904 (1967), *aff'd*, 432 Pa. 522, 248 A.2d 506 (1968), *cert. denied*, 398 U.S. 957, 90 S.Ct. 2161, 26 L.Ed.2d 541 (1970). Although the contract price had already been established by the time Snyder actively confirmed Clampers's orders, the totality of the circumstances suggests that Snyder and Clampers were still trying to account for a contract price that they both knew to be far out of proportion to the work actually needed at the Eckert home.

We also cannot ignore what transpired after the investigation of Snyder's business had begun. On the day when employees of Vic Snyder, Inc. were to appear at an interview with investigating detectives, Snyder called a meeting of those involved in the Eckert transaction to "get the story straight" about what would be said to the detectives. N.T. 3/2/83 at 160. When Daniel Hitchner declined to attend the meeting, Snyder asked Hitchner what he was going to tell the investigators; Hitchner informed Snyder that he was going to tell the truth, that Clampers had told him to clean all the Eckerts' drains to make the price bigger; Snyder told Hitchner he could not divulge Clampers's spurious rationale for cleaning the drains; later that day, when Hitchner had not come to the meeting, Snyder fired him. In crimes involving fraudulent intent, subsequent statements and conduct of the accused revealing a culpable state of mind are often relevant to establish the requisite mens rea at the time of the alleged criminal acts. *United States v. Stoehr*, 196 F.2d 276 (3rd Cir.), *cert.*

*denied,* 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643 (1952). "Acts, conduct, and declarations on the part of the accused showing a desire or disposition to conceal the crime or the results of the crime are generally admissible against him, provided there is other evidence of his participation in the crime." 22A C.J.S. *Criminal Law* § 624 (1961). A conspiracy may be proven by subsequent acts if those acts support an inference of prior agreement. *Commonwealth v. Stephens,* 231 Pa.Super. 481, 331 A.2d 719 (1974); *Commonwealth v. Kelson,* 134 Pa.Super. 132, 3 A.2d 933 (1939). Here Snyder's subsequent acts tend to prove that a corrupt confederation formed to implement criminal activity at the Eckert residence was now being turned to the purpose of concealing that activity.

We are mindful that mere grounds for suspicion and conjecture are insufficient bases for a finding of probable cause. *Commonwealth v. Wojdak, supra.* When the Commonwealth relies on circumstantial proof to establish an inference, the test is whether the fact to be inferred, here a corrupt agreement between Snyder and Clampers, is "more likely than not" to flow from the facts proven. *Id.; Commonwealth v. McFarland,* 452 Pa. 435, 308 A.2d 592 (1973). After a careful study of the evidence, we find sufficient probable cause to believe more likely than not that Snyder and Clampers were in collusion to commit the crimes of theft by deception and deceptive business practices. Thus, the conspiracy count against Clampers and all counts against Vic Snyder, Inc., must be reinstated in the Eckert case.

### IV. Emmens Transaction

In April of 1982, Calvin Emmens was having serious problems with a drain in his home. Every time a toilet was flushed, the water would back up into the kitchen sink. Emmens unsuccessfully tried home remedies for the problem, then engaged an emergency drain cleaning service. The drain cleaners were able to clear the line temporarily, but a few days later sewage was backing up again. After cleaning the line a second time, the cleaners suggested to Emmens that the stack pipe in his basement might be

broken. Emmens then called Vic Snyder, Inc., in on the problem. A representative of the corporation came to the house, made an inspection, and informed Emmens that the stack pipe was rotted or broken. The pipe was encased in concrete to a height of about five feet, and the concrete had to be chipped away for the pipe to be replaced. Emmens agreed to pay $500 to have the work done.

Before replacing the pipe, the corporation dispatched Daniel Hitchner to the Emmens residence to see if he could clean the line. When Hitchner arrived, the basement floor of the Emmens house was covered with raw sewage. With a plumber's snake, Hitchner effectuated a clear passage through the drain. He telephoned Vic Snyder, Inc., and told Vic Snyder personally that the line was clear and the stack pipe operational. Nevertheless, Snyder sent plumbers to the Emmens residence to remove and replace the stack pipe.

The Commonwealth theorizes that since the stack pipe was embedded in concrete and hence inaccessible to physical examination, the representation to Emmens that it was defective must have been unfounded. Snyder's decision to go ahead with replacement of the pipe after Hitchner had told him it was functional establishes, the Commonwealth argues, a prima facie case of theft by deception and deceptive business practices against Snyder and the corporation.

The Commonwealth relies heavily on the opinion of Daniel Hitchner to establish that the pipe did not in fact need to be replaced. Hitchner, who was not a plumber, arrived at his opinion based on the fact that he had been able to clear the whole line and had found no defects in it. However, the line had been cleaned before by another drain cleaner and the solution had proved only temporarily effective. The first drain cleaner was of the opinion that the stack pipe was broken, and told Mr. Emmens it would probably have to be replaced. The Commonwealth points out that the first drain cleaner did not have a plumber's snake long enough to plumb the entire line as Hitchner did, and contends that Hitchner's assessment of the pipe's condition is therefore entitled to greater weight. However, we find it more significant that once the corporation replaced the stack pipe,

the problems Mr. Emmens had had with sewage backing up into his sink ceased. Essentially the evidence discloses a difference of opinion as to the source of Mr. Emmen's difficulties with his plumbing. We are unable to conclude with any certainty from this evidence that Emmens was the victim of false or deceptive representations. Therefore, a prima facie case that the crimes were committed was not made out, and we must uphold the decision of the trial court dismissing the charges against Snyder and the corporation.

The orders appealed from the Court of Common Pleas of Delaware County, granting habeas corpus relief to the appellees, are affirmed in part and reversed in part in accordance with the mandates of this opinion.