COMMONWEALTH of Pennsylvania,
Appellee

v.

Paul Henry ELINE, Appellant.

Superior Court of Pennsylvania.

Argued Oct. 23, 2007.
Filed Dec. 31, 2007.

Andrew B. Zelonis, Barnesville, for appellant.

Charles A. Bressi, Jr., Asst. Dist. Atty., Pottsville, for Com., appellee.

BEFORE: STEVENS, BENDER, and McCAFFERY, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Schuylkill County following Appellant's conviction by a jury on sixteen (16) counts of deceptive business practices where the amount exceeds $2,000.00, and two (2) counts of deceptive business practices where the amount is greater than $200.00 but less than $2,000.00.[1] Appellant raises seven issues for our consideration. We affirm.

¶ 2 The relevant facts and procedural history are as follows: Appellant was arrested and charged with twenty-seven counts of theft by deception and twenty-seven counts of deceptive business practices in connection with his taking of money in exchange for unfulfilled promises to install functioning swimming pools. The Commonwealth maintained that Appellant never intended to install complete, fully functional swimming pools when he took money from numerous unsuspecting customers. On September 21, 2005, Appellant filed a counseled pre-trial *omnibus* motion seeking dismissal of the charges on the basis the Commonwealth had not presented a *prima facie* case during Appellant's preliminary hearing. Appellant contended that, at most, the Commonwealth could prove Appellant breached a civil contract. Appellant also sought the suppression of statements made to and evidence seized by police. Following an evidentiary hearing, by order entered on December 6, 2005, the trial court granted Appellant's pre-trial motion, in part, and dismissed four counts of theft by deception and four counts of deceptive business practices. By order entered on December 8, 2005, the trial court concluded the Commonwealth had established a pattern of misrepresentation regarding twenty-three victims and denied Appellant's pre-trial motion to dismiss as to the counts related to these victims. However, the trial court concluded that any statements made by Appellant to the police should be suppressed since the Commonwealth presented no evidence with regard to the statements.

¶ 3 On January 11, 2006, Appellant filed a motion to sever his cases, which the trial court denied, and Appellant proceeded to a jury trial. At trial, Michael Joseph Lucas testified that, on August 30, 2004, he stopped at Appellant's pool store, gave Appellant $9800.00 as a deposit for the installation of a pool, and signed an agreement. N.T. 1/19/06 at 26–28. Appellant indicated he would begin construction of the pool within two or three weeks. N.T. 1/19/06 at

---

1. Appellant was convicted under 18 Pa.C.S.A. § 4107(a)(2). Sixteen counts were graded as felonies of the third degree since the amount exceeded $2,000.00, 18 Pa.C.S.A. § 4107(a.1)(1)(i), and two counts were graded as misdemeanors of the first degree, 18 Pa. C.S.A. § 4107(a.1)(1)(ii).

27. Mr. Lucas agreed to pay an additional $2,350.00 when the pool walls were installed and another $2,350.00 when the pool was locked down with concrete. N.T. 1/19/06 at 28. In October of 2004, Mr. Lucas arrived home to find a skidster loader sitting in his yard. N.T. 1/19/06 at 31. The loader sat for approximately two weeks and then a two feet deep hole, which was approximately twenty feet by forty feet in diameter, was dug in Mr. Lucas' yard. N.T. 1/19/06 at 31. Two weeks later, Appellant brought a mini excavator to Mr. Lucas' premises but no further work was forthcoming and no pool supplies were delivered. N.T. 1/19/06 at 32. Mr. Lucas attempted to contact Appellant but was unable to do so. N.T. 1/19/06 at 32–33. Mr. Lucas testified that, for $9,800.00, all he received was a two feet hole in his yard without any explanation by Appellant. N.T. 1/19/06 at 34–36.

¶ 4 On cross-examination, Mr. Lucas testified that he made Appellant aware that "time was of the essence" and he wanted the pool installed before winter arrived in 2004. N.T. 1/19/06 at 39. Mr. Lucas admitted that it rained some days in September and October of 2004. N.T. 1/19/06 at 43.

¶ 5 James Paul Hartz testified that, on May 28, 2004, he saw a newspaper advertisement and spoke to Appellant, who indicated that, after he received a deposit, he would begin work on an in-ground pool in approximately two weeks. N.T. 1/19/06 at 48. The next day, Appellant went to Mr. Hartz's home, and Mr. Hartz gave him $1,000.00 as a down payment. N.T. 1/19/06 at 48–49. On June 22, 2004, Mr. Hartz signed a contract and subsequently made payments to Appellant in the amounts of $7,200.00 and $1,700.00. N.T. 1/19/06 at 50. On July 2, 2004, an excavator dug a hole for the in-ground pool and approximately three-quarters of the pool's

walls were installed. N.T. 1/19/06 at 52. Workers returned sporadically, placed all of the walls, and then poured concrete. N.T. 1/19/06 at 53. Apparently, the walls of the pool were not properly braced and, as a result, the walls pushed inward under the weight of the concrete. N.T. 1/19/06 at 53. Appellant installed the liner, which leaked because of holes cut for the skimmer and lights. N.T. 1/19/06 at 54. Although Appellant filled the pool with water, he never hooked up the pumps or filters, resulting in Mr. Hartz's pool water turning green. N.T. 1/19/06 at 54. Mr. Hartz drained the pool, and Appellant returned. N.T. 1/19/06 at 54. Appellant removed the liner and skimmers and never returned to reassemble the pool, resulting in Mr. Hartz possessing a non-functioning, incomplete swimming pool. N.T. 1/19/06 at 55. Near the end of July, Appellant indicated that he would repair Mr. Hartz's pool but he never did so. N.T. 1/19/06 at 56.

¶ 6 Lisa Hartz substantially confirmed Mr. Hartz's testimony. Mrs. Hartz added that she believed Appellant had caller identification and was avoiding her telephone calls since the only time Appellant answered the telephone was when she used a friend's cellular phone. N.T. 1/19/06 at 72.

¶ 7 Paul Cieniewicz testified that, in June of 2004, his wife gave Appellant $9,800.00 as a down payment for an in-ground swimming pool. N.T. 1/19/06 at 108–110. Appellant informed Mr. Cieniewicz he would begin work on the pool in late July of 2004, and it would take approximately one week to install the pool. N.T. 1/19/06 at 113–114. On August 1, 2004, Appellant began digging a hole in the ground for the pool but ran into some shale rock and did not finish digging until September 18, 2004, at which time an employee returned to assemble the pool's

walls. N.T. 1/19/06 at 117–118. One wall of the pool was placed and work temporarily stopped until Mr. Cieniewicz complained to Appellant. N.T. 1/19/06 at 118. Appellant indicated he did not have anymore wall braces but that he was "getting more wall braces." N.T. 1/19/06 at 118. On September 22, 2004, a different crew of men returned and installed two more walls; however, the braces on the two additional walls did not match the braces placed on the first wall. N.T. 1/19/06 at 119. Mr. Cieniewicz determined that the "new braces" were not from the Fort Wayne Pool Company, which is the brand of pool Mr. Cieniewicz ordered. N.T. 1/19/06 at 119. After Mr. Cieniewicz complained, Appellant completed no additional work on the pool. N.T. 1/19/06 at 120. Since Appellant had used parts which were not from the Fort Wayne Pool Company, Mr. Cieniewicz informed Appellant that he wanted his deposit returned immediately, and Appellant said, "No." N.T. 1/19/06 at 122. Appellant never told Mr. Cieniewicz that he could not complete the pool due to poor weather, a lack of permits, or a lack of qualified workers. N.T. 1/19/06 at 123. Although Appellant was supposed to give Mr. Cieniewicz an installation agreement, he did not do so until Mr. Cieniewicz demanded the agreement on September 14, 2004. N.T. 1/19/06 at 111. Barbara Cieniewicz substantially confirmed Mr. Cieniewicz's testimony.

¶ 8 Sheila Wyatt testified that, on April 6, 2004, she contacted Appellant regarding the installation of an above-ground swimming pool and surrounding fence. N.T. 1/19/06 at 161. Ms. Wyatt gave Appellant $1,218.00, and Appellant promised that, once the pool equipment was delivered, Appellant would complete the job within one week. N.T. 1/19/06 at 163. On May 23, 2004, Appellant delivered the pool equipment, and on June 29, 2004, Appellant drew with red paint a circle on Ms.

Wyatt's yard and began digging a hole with picks and shovels. N.T. 1/19/06 at 165. On July 7, 2004, sand was delivered, and Ms. Wyatt left for vacation. N.T. 1/19/06 at 166. When she returned on July 11, 2004, she discovered that some of the pool walls were installed but the walls were visibly dented. N.T. 1/19/06 at 166. Also, part of the walls had no support beneath them and were "kind of just there with nothing under it." N.T. 1/19/06 at 166. Ms. Wyatt complained to Appellant, who came to Ms. Wyatt's house on July 19, 2004. N.T. 1/19/06 at 169. Appellant "walked around the pool, got back in his truck and left." N.T. 1/19/06 at 169. The pool could not be filled with water, and Ms. Wyatt had the partially-constructed pool torn down. N.T. 1/19/06 at 168. Without any refund from Appellant, Ms. Wyatt's husband and friends properly installed the swimming pool. N.T. 1/19/06 at 171–173. Appellant never informed Ms. Wyatt that he could not install the pool due to poor weather, lack of permits, or lack of qualified employees. N.T. 1/19/06 at 172.

¶ 9 Sarah Baldwin testified she saw a newspaper advertisement and ordered an in-ground swimming pool from Appellant on August 30, 2004, signed an installation agreement, gave Appellant a $9,300.00 deposit, and was told the materials would arrive in approximately two weeks. N.T. 1/19/06 at 183–185, 192. On September 20, 2004, Ms. Baldwin telephoned Appellant, who indicated the materials had not yet arrived. N.T. 1/19/06 at 185. Ms. Baldwin telephoned Appellant several times; however, Appellant did not answer the telephone until October 5, 2004, at which time Appellant informed Ms. Baldwin he would begin digging the hole for the pool soon. N.T. 1/19/06 at 186. On October 12, 2004, Ms. Baldwin telephoned Appellant and told him she no longer wanted the swimming pool. N.T. 1/19/06 at 186. Appellant

stopped by the next evening and signed an agreement indicating the pool would be completed by October 30, 2004, or he would return the deposit, which was given to him by Ms. Baldwin. N.T. 1/19/06 at 187. On October 28, 2004, Appellant dug a hole which was approximately one foot deep, and on November 2, 2004, Appellant returned to dig the hole deeper and remove some trees. N.T. 1/19/06 at 190. On November 10, 2004, Appellant unsuccessfully attempted to remove two trees and dug a hole near Ms. Baldwin's bathroom, which was not near where the pool was to be located. N.T. 1/19/06 at 190–191. Although demands were made, Appellant returned no money to Ms. Baldwin, although her credit card company refunded her $5,000, which was the portion of the deposit Ms. Baldwin placed on the card. N.T. 1/19/06 at 192. Appellant provided Ms. Baldwin with no explanations and, in fact, did not even telephone her. N.T. 1/19/06 at 193.

¶ 10 Timothy Schofield testified he responded to a newspaper advertisement, contacted Appellant in order to have an in-ground swimming pool installed, and signed an installation agreement on July 10, 2004. N.T. 1/19/06 at 201–203. Mr. Schofield gave Appellant a deposit of $8,800.00, and Appellant informed Mr. Schofield he would begin the job within two weeks and have the pool completed during the first week of August, 2004. N.T. 1/19/06 at 204. Appellant informed Mr. Schofield that he "wasn't that busy" and could have the pool installed quickly. N.T. 1/19/06 at 204. By August, 2004, nothing had been done, and Mr. Schofield attempted to contact Appellant, who did not take Mr. Schofield's telephone calls. N.T. 1/19/06 at 204–206. In mid-August of 2004, Appellant answered the telephone, and Mr. Schofield demanded the return of his deposit. N.T. 1/19/06 at 206. Appellant indicated he would come to Mr. Scho-field's house to discuss the situation, and during the next week, pool supplies began appearing in Mr. Schofield's yard. N.T. 1/19/06 at 207. Appellant and Mr. Schofield discussed the situation, decided to proceed with the pool, and Appellant dug a six inch deep hole. N.T. 1/19/06 at 207. Several weeks passed without any further work being completed; however, at some point, heavy equipment was placed in Mr. Schofield's yard. N.T. 1/19/06 at 209. In mid-September of 2004, Mr. Schofield telephoned Appellant and told him that, until all of the pool supplies were delivered, Appellant should proceed no further. N.T. 1/19/06 at 209. Appellant retrieved his equipment, delivered no pool supplies, did no further work, and refused to refund Mr. Schofield's deposit. N.T. 1/19/06 at 209–210.

¶ 11 Thomas G. Hocking testified that, on June 22, 2004, Appellant came to his residence to sell him an in-ground swimming pool. N.T. 1/20/06 at 221. Mr. Hocking gave Appellant a check for $7,800.00, and Appellant promised to have the pool installed within two weeks. N.T. 1/20/06 at 223. After making repeated requests for Appellant to begin the project, on July 29, 2004, employees dropped off some pool parts. N.T. 1/20/06 at 224. On August 3, 2004, Appellant began digging a hole for the pool, which he finished on August 9, 2004, at which time four men began placing the pool's walls. N.T. 1/20/06 at 226. The men did not return to finish the job, and Appellant never answered Mr. Hocking's telephone calls. Therefore, Mr. Hocking went to Appellant's place of business at 6:30 a.m. one morning to discuss the situation. N.T. 1/20/06 at 227. Mr. Hocking demanded the return of his money, and Appellant refused, indicating he would complete the pool and fix all problems. N.T. 1/20/06 at 228. Thereafter, Appellant sent another

man to Mr. Hocking's residence, and the man indicated the pool was not dug properly and the walls needed to be removed. N.T. 1/20/06 at 228. The man took out the walls and re-dug the hole. N.T. 1/20/06 at 228. No other work was completed thereafter. N.T. 1/20/06 at 229. Mr. Hocking complained to Appellant, who signed an agreement on September 28, 2004, indicating installation would begin on October 3, 2004, and be completed by October 15, 2004. N.T. 1/20/06 at 231. No further work was ever done by Appellant, despite Mr. Hocking's repeated demands for such, and Appellant neither contacted nor refunded money to Mr. Hocking. N.T. 1/20/06 at 233–234, 236. Although Appellant promised a fully functional in-ground pool, all Mr. Hocking received for $7,800.00 was some walls, a hose, and a hole. N.T. 1/20/06 at 253.

¶ 12 Ken Reber testified that he responded to a newspaper advertisement and contacted Appellant on June 13, 2004, in order to have an in-ground swimming pool installed. N.T. 1/20/06 at 255. Mr. Reber gave Appellant a $7,200.00 deposit, and in August of 2004, after the well was completed at Mr. Reber's new home, he contacted Appellant to have the pool installed. N.T. 1/20/06 at 257–259. Appellant told Mr. Reber he would begin installation in approximately two weeks. N.T. 1/20/06 at 259. During the first week of October of 2004, Appellant placed four stakes in Mr. Reber's ground. N.T. 1/20/06 at 261. No other work was performed. N.T. 1/20/06 at 261. Appellant never answered Mr. Reber's telephone calls, and, therefore, Mr. Reber stopped by Appellant's place of business. N.T. 1/20/06 at 262. Appellant indicated he was "very busy" and "could not talk right now" and Mr. Reber would "have to leave." N.T. 1/20/06 at 262. Appellant did not refund Mr. Reber's deposit. N.T. 1/20/06 at 262–263.

¶ 13 Jay Hyneman testified he saw a newspaper advertisement, contacted Appellant on August 7, 2004 to have a swimming pool installed, and gave Appellant a $10,300.00 deposit. N.T. 1/20/06 at 268–270. Appellant indicated he would begin construction of the pool near Labor Day but he did not do so. N.T. 1/20/06 at 271. Near the end of September of 2004, Appellant dug a trench for a wall, and in early November of 2004, he began digging a hole for the pool and his crew delivered landscape blocks. N.T. 1/20/06 at 272–273. Appellant did no further work, and when asked why there was a delay, Appellant indicated his dump truck needed to be repaired. N.T. 1/20/06 at 275. Appellant never refunded Mr. Hyneman's deposit. N.T. 1/20/06 at 276.

¶ 14 Jeffrey Tellez testified he contacted Appellant on August 28, 2004, in order to have a swimming pool installed, and he signed an installation agreement. N.T. 1/20/06 at 285. Mr. Tellez gave Appellant a total of $10,000.00 as a deposit, and Appellant stated the pool would be completed in two weeks. N.T. 1/20/06 at 288–289. Mr. Tellez telephoned Appellant repeatedly, and Appellant came to his property in October of 2004. N.T. 1/20/06 at 290. At this time, Appellant removed a few tree stumps and partially removed part of Mr. Tellez' concrete patio; on November 6, 2004, Appellant began digging a hole for the swimming pool. N.T. 1/20/06 at 291. After digging a hole for about half of the pool, no other work was completed. N.T. 1/20/06 at 291. Appellant never provided any reason for the delay, and despite requests from Mr. Tellez, he did not refund Mr. Tellez's deposit. N.T. 1/20/06 at 293.

¶ 15 Gary L. Bruen testified that he stopped at Appellant's business on May 27, 2004, in order to have a swimming pool

installed, and approximately one week later, Appellant came to Mr. Bruen's residence. N.T. 1/20/06 at 304–305. Appellant indicated that, once an order was placed, the pool supplies would be delivered within a week and a half, and within three and one-half weeks, the pool would be completed and fully functional. N.T. 1/20/06 at 305–306. Mr. Bruen gave Appellant a $1,000.00 deposit on May 27, 2004, and a $5,000.00 deposit on June 3, 2004. N.T. 1/20/06 at 307. On June 25, 2004, the excavator began digging, and a pool was installed by early-September of 2004. N.T. 1/20/06 at 308–309. However, "[t]he walls were bowed and out of level. There was coping, which is the liner on the top of the pool, was unsafe." N.T. 1/20/06 at 309. The filter and pump were not working properly and the bottom of the pool did not look right. N.T. 1/20/06 at 309–310. Appellant refused to fix any of the problems and demanded full payment. N.T. 1/20/06 at 310–311.

¶ 16 Michael Cochrane testified he saw a newspaper advertisement and contacted Appellant on May 28, 2004, in order to have a swimming pool installed. N.T. 1/20/06 at 324. On June 7, 2004, Mr. Cochrane gave Appellant a $7,860.00 deposit so that Appellant could order the pool supplies. N.T. 1/20/06 at 325. On June 15, 2004, Mr. Cochrane signed an agreement, and Appellant informed him it would take two weeks for the supplies to arrive and approximately another two to four weeks to complete a fully functional swimming pool. N.T. 1/20/06 at 329. The pool supplies arrived, employees began work on June 26, 2004, and they worked periodically until August 12, 2004. N.T. 1/20/06 at 330. At the completion of all work by Appellant, Mr. Cochrane did not have a fully functional pool in that the plumbing, pump, and filter were not hooked up and the walkway around the pool was not completed. N.T. 1/20/06 at 331. Mr. Coch-

rane gave Appellant an additional $3,000.00 on August 3, 2004. N.T. 1/20/06 at 333. Appellant said he could not complete the project because he was busy. N.T. 1/20/06 at 334–335.

¶ 17 Michael Phillips testified that he works for M & T Bank. From May of 2004 until August of 2004, Appellant spent $15,304.24 on advertising, and from April 4, 2004 until October 18, 2004, Appellant transferred $28,000.00 from his business account to his personal account. N.T. 1/20/06 at 344–346. From April to October, 2004, Appellant wrote checks for pool supplies totaling $82,236.62. N.T. 1/20/06 at 345.

¶ 18 Frederick Ricco testified that, on June 25, 2004, he saw a newspaper advertisement and contacted Appellant about the installation of a swimming pool. N.T. 1/23/06 at 361–362. Mr. Ricco gave Appellant a $7,200.00 deposit and another check for $2,491.50, and he signed an installation agreement. N.T. 1/23/06 at 362–363. Appellant indicated Mr. Ricco's pool would be fully functional within two to three weeks, and Appellant performed work on Mr. Ricco's pool from July 12, 2004 until mid-September of 2004. N.T. 1/23/06 at 364. At the completion of all work performed by Appellant, the pool was not functioning because there was no electrical work completed. N.T. 1/23/06 at 364. While there was water and a liner in the pool, the pumps, filter, and other components were never provided. N.T. 1/23/06 at 364. Mr. Ricco made demands for the completion of all work and a refund of some money. N.T. 1/23/06 at 366. Appellant made no refund. N.T. 1/23/06 at 367. In October of 2004, Mr. Ricco learned Appellant's liability insurance had lapsed, and therefore, when workers arrived to do some concrete work, Mr. Ricco indicated they had to leave. N.T. 1/23/06 at 379–380.

¶ 19 Clark Romberger testified that he saw an advertisement in the newspaper, contacted Appellant on July 27, 2004, in order to have a swimming pool installed, and signed an installation agreement. N.T. 1/23/06 at 381–382. Mr. Romberger paid Appellant $9,300.00 as a deposit, and he was told the work would be completed by the end of August of 2004. N.T. 1/23/06 at 383–384. In mid-August of 2004, the hole was dug and pool wall panels were installed; only part of the pool's concrete floor was installed. N.T. 1/23/06 at 385. Appellant gave Mr. Romberger a bill for $3,045.00, which Mr. Romberger refused to pay. N.T. 1/23/06 at 386. Mr. Romberger indicated that the work, which Appellant had already done, was shoddy in that the pool's walls were not properly anchored and wash out occurred, resulting in no concrete around the walls. N.T. 1/23/06 at 386. Mr. Romberger requested completion of the job, and Appellant said to just leave him alone and let him do his job. N.T. 1/23/06 at 387. In late-September of 2004, Mr. Romberger asked that the contract be voided and Appellant should return Mr. Romberger's money. N.T. 1/23/06 at 390. Appellant refused. N.T. 1/23/06 at 390. In early-October of 2004, Mr. Romberger demanded the pool be completed by October 15, 2004, and Appellant indicated it would be "no problem;" however, Appellant did no additional work on Mr. Romberger's property. N.T. 1/23/06 at 387–388.

¶ 20 Kathy Herb testified that she saw an advertisement in the newspaper, and she contacted Appellant on June 10, 2004, to have an above-ground pool installed. N.T. 1/23/06 at 400–401. Appellant agreed to order a specific deck and pool from the pool manufacturer so that Ms. Herb's elderly father could enter the pool. N.T. 1/23/06 at 410. Ms. Herb paid Appellant $2,637.82, and Appellant indicated the pool supplies would arrive in approximately three weeks. N.T. 1/23/06 at 401–402. After approximately three weeks had passed without any work being done, Ms. Herb began calling Appellant. N.T. 1/23/06 at 403. Eventually, the pool was installed; however, Appellant supplied neither the ladder nor the deck for the pool. N.T. 1/23/06 at 404. As a result, neither Ms. Herb's children nor elderly father could get into the pool. N.T. 1/23/06 at 404. After making a demand, Appellant gave her the ladder from the showroom; however, he never installed the deck. N.T. 1/23/06 at 404–405. Ms. Herb's repeated telephone calls to Appellant went unanswered. N.T. 1/23/06 at 405. Appellant never told Ms. Herb that he was unable to install the deck; he just did not do so. N.T. 1/23/06 at 405–406. Appellant never gave Ms. Herb an installation agreement; however, he gave her a sales slip. N.T. 1/23/06 at 408. Ms. Herb and her husband went to Appellant's place of business to see if they could find their special-order deck; however, it was not on Appellant's premise. N.T. 1/23/06 at 410.

¶ 21 Joseph Cafoncelli testified that he contacted Appellant on August 16, 2004, in order to have a pool installed, he gave Appellant a deposit of $9,800.00, and he signed an installation agreement. N.T. 1/23/06 at 412, 414. Appellant indicated that, once he began digging for the pool, it would take approximately two weeks to finish the installation. N.T. 1/23/06 at 413–414. In September or October of 2004, Appellant began digging for the in-ground pool and placed the pool's walls. N.T. 1/23/06 at 415. On November 11, 2004, Mr. Cafoncelli indicated he gave Appellant an additional $4,543.00, and Appellant poured concrete to "lock down the walls." N.T. 1/23/06 at 415. Appellant completed no additional work on Mr. Cafoncelli's pool, resulting in Mr. Cafoncelli

having a non-functioning pool. N.T. 1/23/06 at 416.

¶ 22 Michael Ledbetter testified he contacted Appellant near the end of July of 2004, and Appellant indicated he could have an in-ground pool installed within one month. N.T. 1/23/06 at 428. Mr. Ledbetter signed an agreement on July 27, 2004, for the installation of an in-ground swimming pool and gave to Appellant a $5,800.00 deposit. N.T. 1/23/06 at 429–430. The agreement contained a notation indicating the pool would be completed by August 27, 2004. N.T. 1/23/06 at 430. By the end of August, 2004, all that Appellant had done was dig part of the hole for the swimming pool. N.T. 1/23/06 at 431–432. Mr. Ledbetter continued to call Appellant, who indicated the pool would be completed by September 24, 2004, and eventually a crew appeared at Mr. Ledbetter's home with various pool supplies. N.T. 1/23/06 at 432–433, 442. Mr. Ledbetter indicated that some of the parts were manufactured by Fort Wayne, which was the company from which he was expecting his pool to be manufactured, and some of the parts were from "somebody else's pool." N.T. 1/23/06 at 433. The crew installed roughly three-quarters of the pool's walls and then demanded a second payment in order to "lock down" the walls with cement. N.T. 1/23/06 at 433. Mr. Ledbetter expressed his belief that all of the walls needed to be installed before the concrete was poured but the men indicated negatively. N.T. 1/23/06 at 433. On approximately October 9, 2004, the men poured the concrete, breaking the pool's walls. N.T. 1/23/06 at 433, 437. Mr. Ledbetter contacted Appellant, who indicated he would complete the job. N.T. 1/23/06 at 433–434. No further work was completed by Appellant, Mr. Ledbetter did not receive a refund from Appellant, and Mr. Ledbetter does not have a functioning swimming pool. Mr. Ledbetter received the pool's steps, part of the pool's walls, and braces for the walls, which were not manufactured by Fort Wayne. N.T. 1/23/06 at 443. Mr. Ledbetter testified he did not realize the braces were not Fort Wayne parts until after they were installed, and since then, Fort Wayne has informed Mr. Ledbetter that the pool's warranty is void because he used unauthorized parts. N.T. 1/23/06 at 443–444.

¶ 23 Diana Schappell testified that she contacted Appellant on July 10, 2004, in order to have an in-ground pool installed, she gave Appellant a deposit of $7,200.00 to order the pool supplies, and she signed an installation agreement. N.T. 1/23/06 at 445–447. Appellant indicated her pool would be finished by the end of July, 2004. N.T. 1/23/06 at 448. Appellant never began the work in July of 2004, and so Ms. Schappell attempted on numerous occasions to contact him. N.T. 1/23/06 at 448. Appellant indicated on August 9th and 19th that he would begin work on the pool the next day but he did not do so. N.T. 1/23/06 at 449. On August 23, 2006, a crew of men appeared at Ms. Schappell's house at 9:00 a.m. but they did not begin working until Appellant appeared at 1:00 p.m., at which time they began digging a hole for Ms. Schappell's pool. N.T. 1/23/06 at 449. Eventually, the pool's walls were placed, and on September 11, 2004, Ms. Schappell gave Appellant a second payment of $2,897.00, so that he would cement the pool's walls. N.T. 1/23/06 at 448, 451. On September 21, 2004, Appellant installed the vermiculate; however, he completed no other work after that time. N.T. 1/23/06 at 451. Ms. Schappell contacted Appellant regarding the installation of the pool's pumps and filters, and Appellant indicated several times he would install them, however, he did not do so. N.T. 1/23/06 at 451–452. Ms. Schappell received no refund from Appellant even though he did not complete the pool. N.T. 1/23/06 at 452.

Appellant provided no explanation as to why he did not finish the pool.

¶ 24 William Hill testified that he saw an advertisement in a newspaper, and on August 14, 2004, he contacted Appellant to have an in-ground pool installed. N.T. 1/23/06 at 461–462. Mr. Hill signed an installation agreement and gave Appellant $7,200.00. N.T. 1/23/06 at 463. Appellant told Mr. Hill the pool's parts would arrive a week or two after Labor Day and it would take three to five days to install the pool. N.T. 1/23/06 at 463. Appellant never appeared again at Mr. Hill's property, and in fact, no work was ever done. N.T. 1/23/06 at 463–464. Mr. Hill telephoned Appellant numerous times, and on October 12, 2004, he sent Appellant a registered letter requesting a refund. N.T. 1/23/06 at 464. Mr. Hill never received a refund. N.T. 1/23/06 at 465. Mr. Hill saw Appellant at another person's home and he demanded a refund. N.T. 1/23/06 at 466. Appellant indicated he would meet with Mr. Hill at another time but he never did so. N.T. 1/23/06 at 466.

¶ 25 John Cataldo testified he saw a newspaper advertisement and contacted Appellant on July 21, 2004, in order to have an in-ground pool installed, he gave Appellant a deposit of $7,200.00, and he signed an installation agreement. N.T. 1/23/06 at 475–476, 485. Shortly thereafter, Appellant indicated he had made a mistake and he would need a deposit of $9,800.00 but that he did not need the additional money until he started the pool installation. N.T. 1/23/06 at 478. Appellant indicated it would take three to four weeks to complete the pool. N.T. 1/23/06 at 479. Mr. Cataldo contacted Appellant several times in August of 2004, and on September 1, 2004, because Appellant had not even started the installation let alone completed it within four weeks, Mr. Cataldo requested a full refund of his deposit. N.T. 1/23/06 at 479. Appellant indicated he would refund the money but he did not do so. N.T. 1/23/06 at 479. Appellant did no work on Mr. Cataldo's property. N.T. 1/23/06 at 481.

¶ 26 Michael Gallo testified that from April of 2004 until October 18, 2004, he was an excavator for Appellant. N.T. 1/23/06 at 488. He testified that, in installing a pool, an excavator digs a hole, the exterior walls are placed, footers are installed, and then the excavator backfills dirt behind the walls to raise the ground level to the top of the pool. N.T. 1/23/06 at 490. From April to October of 2004, Mr. Gallo dug holes for approximately fifteen to twenty pools; however, he did not complete any one job. N.T. 1/23/06 at 490. He testified that "I'd get so far on one job, and I'd be sent to another job site; start that job, sent to another job site, and constantly shifted around from site to site." N.T. 1/23/06 at 490–491. Mr. Gallo indicated Appellant was the person who sent him to the job sites. N.T. 1/23/06 at 491. Mr. Gallo testified he was asked to leave job sites at the end of the day, take heavy equipment to different job sites and leave the equipment overnight, where he would then pick up the heavy equipment the next day and take it to a different job site. N.T. 1/23/06 at 492. Mr. Gallo testified that during the relevant time period he only backfilled properly one pool. N.T. 1/23/06 at 492. Mr. Gallo testified that Appellant did not have a warehouse and he stored pool parts at a lot next to his office. N.T. 1/23/06 at 494.[2]

¶ 27 Appellant presented the testimony of Stephen Mazur, Jr., who was offered as

---

**2.** At the conclusion of the Commonwealth's case-in-chief, the trial court granted Appellant's motion for dismissal as to victims McElvaney, Reedy, and Blozousky since there was no testimony presented regarding their dealings with Appellant. N.T. 1/23/06 at 511–512.

an expert in excavating. N.T. 1/24/06 at 529–530. He testified that weather conditions are a "major factor" in excavating, heavy equipment cannot be maneuvered in wet conditions, and backfilling is difficult when the soil is saturated with water. N.T. 1/24/06 at 533, 536. Mr. Mazur indicated that he was unable to complete many of his excavation projects in Schuylkill and Berks Counties during the summer of 2004 due to wet conditions. N.T. 1/24/06 at 534. He indicated that he booked jobs in the spring of 2004 which could not be completed until the spring of 2005 due to the wet conditions. N.T. 1/24/06 at 534–535. Mr. Mazur admitted that he had never performed any pool installation, he did not know of the specific conditions at any of the victims' homes, and he did not personally observe the condition of any of Appellant's work. N.T. 1/24/06 at 541. Mr. Mazur indicated that he accepted five or six excavation projects for 2004, which was an average amount. N.T. 1/24/06 at 542. He admitted that a crew of five or six full-time men could not complete twenty jobs in that time period. N.T. 1/24/06 at 543.

¶ 28 At the conclusion of all testimony, the jury convicted Appellant of eighteen counts of deceptive business practices,[3] and Appellant was sentenced to an aggregate of ten to twenty years in prison and ordered to pay $154,193.50 in restitution. Appellant filed a timely post-sentence motion seeking a judgment of acquittal on the basis of insufficient evidence, a new trial based on various alleged evidentiary errors, and modification of his sentence on the basis the court failed to consider Appellant's poor health and advanced age, the sentence was grossly disproportionate to the crime, and the trial court did not state adequate reasons on the record for the sentence.[4] By opinion and order, the trial court denied Appellant's post-sentence motion, and Appellant filed a timely notice of appeal to this Court. The trial court did not order Appellant to file a Pa.R.A.P. 1925(b) statement, and no such statement was filed.

¶ 29 Appellant's first contention is that the evidence was insufficient to convict him of deceptive business practices as to victims Joseph Cataldo, Thomas Hocking, James Hartz, Clark Romberger, William Schappell, Jeff Tellez, Michael Cochrane, Timothy Schofield, Paul Cieniewicz, Fred Ricco, William Hill, Kenneth Reber, Joseph Cafoncelli, Sarah Baldwin, Jay Hyneman, Kathy Herb, Michael Ledbetter, and Michael Lucas. Appellant specifically avers that the evidence was insufficient since there was no evidence Appellant represented in writing or otherwise that the victims received a greater quantity of services or parts than what was actually delivered and installed. Moreover, Appellant claims that the Commonwealth failed to show that, given time, he would have satisfactorily completed all of the swimming pools, and therefore, the Commonwealth did not establish any element of intent.[5]

---

3. The jury acquitted Appellant on twenty counts of theft by deception and two counts of deceptive business practices as to the Bruens and Ms. Wyatt.

4. Appellant also filed an amendment to his post-sentence motion in which he requested the trial court consider the fact Appellant testified favorably for the Commonwealth in an unrelated solicitation to commit homicide case filed against Forrest V. Pawling, Jr.

5. Intertwined in Appellant's sufficiency argument is a bald assertion that the judge failed to properly instruct the jury on the culpability required for a violation of Section 4107(a)(2). See Appellant's Brief at 10–11. We have discussed this assertion in connection with Appellant's fifth appellate claim.

¶ 30 "In reviewing the sufficiency of the evidence, we view all the evidence admitted at trial in the light most favorable to the Commonwealth, as verdict winner, to see whether there is sufficient evidence to enable the jury to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Thomas,* 522 Pa. 256, 260, 561 A.2d 699, 702 (1989) (citation omitted). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Sanders,* 426 Pa.Super. 362, 627 A.2d 183, 185 (1993) (citation omitted). Although a conviction must be based on "more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty." *Commonwealth v. Badman,* 398 Pa.Super. 315, 580 A.2d 1367, 1372 (1990) (citation omitted).

¶ 31 18 Pa.C.S.A. § 4107(a)(2) provides the following:

**(a) Offense defined.**-A person commits an offense if, in the course of business, the person:

\* \* \*

(2) sells, offers or exposes for sale, or delivers less than the represented quantity of any commodity or service;....

(bold in original).

¶ 32 Citing to *Commonwealth v. Snyder,* 335 Pa.Super. 19, 483 A.2d 933 (1984), Appellant first argues he could not be convicted under Subsection 4107(a)(2) since there was no evidence he made any written or verbal representations indicating the victims received something (commodities or services) that was not actually

delivered. We conclude Appellant has misinterpreted *Snyder* and Subsection 4107(a)(2).

¶ 33 In *Snyder,* the defendant was charged with, *inter alia,* deceptive business practices under Subsections 4107(a)(2) **and** (a)(6). The version of Subsection 4107(a)(6) in effect at that time [6] provided that a person was guilty of deceptive business practices if he "makes a false or misleading written statement for the purpose of obtaining property or credit...." 18 Pa.C.S.A. § 4107(a)(6). In analyzing whether a *prima facie* case had been established against the defendant under Subsections 4107(a)(2) and (a)(6), this Court stated, "We also find sufficient *prima facie* evidence to show that [defendant] engaged in deceptive business practices by delivering less than the bargained-for quantity of goods or services to the [victims], and by representing in writing that the greater quantity had been provided. *See id.* § 4107(a)(2), (6)." *Snyder,* 483 A.2d at 939. That portion of our *Snyder* opinion relating to the defendant making a representation in writing that he had delivered a greater quantity of goods/services than he had actually delivered established guilt under Subsection 4107(a)(6). No such requirement is necessary for a conviction under Subsection 4107(a)(2). Therefore, there was no need for the Commonwealth to establish under Subsection 4107(a)(2) that Appellant attempted to "convince" or otherwise represented to the victims that he had actually delivered the goods or services. Therefore, we find this portion of Appellant's sufficiency claim to be meritless as a matter of law.

¶ 34 Regarding Appellant's claim that the Commonwealth failed to show that, given time, he would have satisfactorily

---

**6.** We note that Subsection (a)(6) has been amended. The current version now provides it is a deceptive business practice when one

"makes or induces others to rely on a false or misleading written statement for the purpose of obtaining property or credit...."

completed all of the swimming pools, and therefore, the Commonwealth did not establish any element of intent, we find the issue to be meritless.

¶ 35 In *Commonwealth v. Maleno*, 267 Pa.Super. 560, 407 A.2d 51 (1979), this Court concluded that fraud, which includes a wrongful intent to deceive, is an element of the crime of deceptive business practices. In the instant case, we conclude that, as to the specific victims listed by Appellant, the Commonwealth sufficiently proved that Appellant took a deposit, and sometimes a second payment, with the intent of not completing the agreed upon work. This intent is confirmed by the fact Appellant neither began nor completed the installation of any pool within the time frame verbally agreed upon, and, after Appellant was given money, he was non-responsive to repeated telephone calls and inquiries made by the victims. Although none of the victims were given what was promised to them by Appellant, Appellant refunded no portion of their money when demands were made. Moreover, we note that Appellant's employee's testimony confirms Appellant's wrongful intent in that the employee indicated he was sent to various jobs throughout the summer and completed only one job successfully. Moreover, Appellant would have him leave equipment at a job site, only to have it retrieved in the morning. Therefore, we find the evidence to be sufficient.

¶ 36 Appellant's second contention is that the evidence was insufficient to demonstrate deceptive business practices as to victim Kathy Herb since she received a functioning swimming pool and ladder. We disagree.

¶ 37 Ms. Herb experienced the same problems as the other victims, namely, Appellant verbally agreed to a specific time frame for the installation of the pool after he received Ms. Herb's money, Appellant did not meet the specific time frame, and Appellant was generally unresponsive to Ms. Herb's numerous inquiries. In addition, Ms. Herb testified that the money she gave to Appellant included money for the installation of a specific deck, which was to be used for ingress and egress from the pool by her elderly father. Appellant neither provided the deck nor a refund to Ms. Herb. We find unavailing Appellant's suggestion the evidence was insufficient since there is no evidence Ms. Herb was given an installation agreement. Ms. Herb testified regarding her verbal contract with Appellant, as well as the fact Appellant gave her a sales slip. This was sufficient.

¶ 38 Appellant's third contention is that, as to thirteen of the victims,[7] the Commonwealth failed to prove that the amount exceeded $2,000.00. Appellant has developed no specific arguments regarding this claim. In any event, we have reviewed the evidence and conclude it sufficiently supports the finding that the amount exceeded $2,000.00 as to the victims challenged by Appellant. *See* Trial Court Opinion filed 11/29/06 at 4–8.

¶ 39 Appellant's fourth contention is the trial court erred in denying Appellant's request for a continuance. We find this issue to be waived.

¶ 40 Appellant's entire argument on this issue is as follows:

> The court erred when it denied defendant's motion for a continuance of the trial when counsel was recently appointed and did not have sufficient time to

---

7. Appellant lists Mr. Hocking, Mr. Romberger, Mr. Schappell, Mr. Tellez, Mr. Cochrane, Mr. Schofield, Mr. Cieniewicz, Mr. Ricco, Mr.

Cafoncelli, Ms. Baldwin, Mr. Hyneman, Mr. Ledbetter, and Mr. Lucas.

examine the two boxes of material, discovery prior to trial.

A case of this magnitude with over 40 counts and multiple cha[r]ges require months to prepare for trial. Besides the fact that there was over twenty alleged victims and each one being case specific there is much research necessary for trial case law, motions to be filed, hearing[s] to attend and prepare for, · etc. Attorney Kurtz was court appointed counsel for [Appellant] on about August 25, 2005 (See Exhibit # 10). The court appointment was for more cases tha[n] are on appeal here. Therefore, Attorney Kurtz had approximately four months and three weeks to prepare for this complicated case, which is insufficient time to prepare adequately.

Appellant's Brief at 22.

■ ¶ 41 Appellant has failed to indicate precisely where in the record he requested a continuance, has failed to cite any authority supporting his position, and has failed to indicate what additional measures he would have taken had counsel had additional time to prepare. Therefore, we find the issue to be waived. *See* Pa.R.A.P. 2119.

¶ 42 Appellant's fifth contention is the trial court erred in failing to charge the jury with the necessary culpability required for Section 4107(a)(2). Appellant's appellate argument is as follows:

The court erred when it failed to instruct the jury that it could not find defendant guilty if his conduct was only negligently deceptive. As stated above on pages 4–5,[8] the Commonwealth must

prove culpability, i.e., knowingly or recklessly. Without rehashing the same argument above, we ask the court to incorporate that argument here, (p. 4–5) as set forth in full detail. I[n] conclusion, when the Judge failed to charge the jury with the standards of culpability needed in this case it w[as] a critical and prejudicial error which requires a new trial.

Appellant's Brief at 23.

¶ 43 Aside from this paragraph, the only other argument developed regarding the alleged error in the trial court's jury instruction was presented in the argument portion of Appellant's first issue as follows:

In the Judge's charge of the jury, the Judge failed to instruct the jury on the culpability necessary to convict the appellant. (TR p. 583–584). What the Judge did is provide a charge that it is a complete defense if the appellant proves by a preponderance of the evidence that his conduct was not knowingly or recklessly deceptive. (TR p. 583). However, because of Title 18 section 302(c), as stated above, the Judge should have charged the jury with the culpability standards provided in that section. A failure to charge the jury with these standards leaves the jury with an impression that no culpability is needed to prove this offense.

Appellant's Brief at 10–11.

■ ¶ 44 We conclude Appellant has not developed a proper argument permitting meaningful appellate review. In particular, Appellant has not indicated that place in the record where he preserved an objection to the jury charge,[9] failed to cite any

---

8. We have reviewed pages four and five of Appellant's brief, there is no jury charge argument developed thereon.

9. In fact, a review of the record reveals that Appellant consented to the portion of the jury

charge now at issue. Prior to instructing the jury, the following exchange occurred at trial:

THE COURT: There is the standard charge attached to 15.4107 a defense, and it reads as follows. It is a complete defense to prosecution under this section if the defendant proves by a preponderance of the evi-

authority supporting his claim, and has essentially presented his jury charge claim as an afterthought in connection with his sufficiency of the evidence claim. *See* Pa. R.A.P. 2119. We decline to develop the issue for Appellant and find it to be waived on this basis.

¶ 45 Appellant's sixth contention is that, in charging the jury, the trial court erred in failing to explain to the jury that "the amount involved" means the value of the commodity or service, which was not delivered. We find this issue to be waived.

¶ 46 Appellant failed to object to the jury instruction in any manner. It is well-settled that an Appellant must lodge a specific instruction in order to preserve challenges to a jury instruction. Pa.R.A.P. 302(b). Since Appellant never objected, his issue is waived on appeal.

■■■ ¶ 47 Appellant's seventh contention is that the trial court failed to give adequate consideration to Appellant's poor health and advanced age in imposing Appellant's sentence.[10] In essence, Appellant is alleging the trial court abused its discretion in failing to consider certain mitigating factors in sentencing Appellant.

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, bias or ill-will. *Commonwealth v. Reyes*, 853 A.2d 1052, 1055 (Pa.Super.2004) (quotation omitted). "A defendant cannot appeal as of right from the discretionary aspects of a sentence. 42 Pa.C.S.A. § 9781(b)." *Commonwealth v. Matroni*, 923 A.2d 444, 454 (Pa.Super.2007) (quotation omitted). An appellant must raise a substantial question as to whether the court properly considered the sentencing guidelines. *See id.* "[T]his Court has held on numerous occasions that a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review." *Id.* at 455 (quotation, quotation marks, and citations omitted).

■■ ¶ 48 Appellant's final claim is that the trial court did not state adequate reasons on the record as to why Appellant's minimum sentence exceeded the sentencing guidelines.[11] While this issue raises a substantial question permitting our review, *Reyes, supra,* we find the issue to be meritless.

¶ 49 In addressing the issue, the sentencing court stated the following:

The Defendant's final motion is for a modification of sentence on the ground that the court did not adequately explain

---

dence that his conduct was not knowingly or recklessly deceptive. This means that the defendant must prove to you that it is more likely than not that his conduct was not knowingly or recklessly deceptive. Do you want me to give that charge, [defense counsel]? And then I would go on as the charge suggests with defining knowingly and recklessly.
DEFENSE COUNSEL: Yes.
N.T. 1/24/06 at 578–579. This provides a basis for finding waiver, as well. *See* Pa. R.A.P. 302(b).

10. We note that Appellant raised this issue in his post-sentence motion. Appellant did not include in his appellate brief a Pa.R.A.P. 2119(f) statement; however, the Commonwealth has not objected to the omission thereof. Therefore, we decline to find waiver on this basis. *See Commonwealth v. Robertson,* 874 A.2d 1200 (Pa.Super.2005).

11. This issue was raised in Appellant's post-sentence motion.

why it gave a minimum sentence that was outside of the guidelines. On the contrary, we sentenced within the standard range to 1–2 years on each of the first 10 counts of deceptive business practices where the amount exceeds $2,000.00. Before imposing sentence, we specifically expressed our observations of the Defendant in that he continued to take money from the alleged victims after complaints were being lodged against him and after the people were begging him to come finish the work he started. We agreed with the District Attorney's statement that the Defendant showed no remorse; that he had an opportunity to remedy his mistakes with the victims but chose not to do so. We also reviewed the pre-sentence investigation report. Having done so, we do not believe that we were required to delineate further our reasons for imposing the sentence we did.

Trial Court Opinion filed 11/29/06 at 11.

¶ 50 In addition, we note the trial court expressly indicated it considered the pre-sentence report, was aware of the relevant information regarding Appellant's character, and weighed those considerations along with the mitigating statutory factors. Therefore, we find no abuse of discretion.

¶ 51 Affirmed.