J-A02021-15

2015 PA Super 152

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| ALWASI YONG | |
| Appellant | No. 1972 EDA 2013 |

Appeal from the Judgment of Sentence of June 12, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0002313-2012

BEFORE: PANELLA, J., LAZARUS, J., and WECHT, J.

OPINION BY WECHT, J.: **FILED JULY 16, 2015**

This appeal requires that we determine the precise scope of the "collective knowledge doctrine" in Pennsylvania. We conclude that the trial court's application of the doctrine to the facts of Alwasi Yong ("Yong")'s arrest stretched the rule beyond its breaking point. As a result, the trial court erred in denying Yong's pretrial motion to suppress physical evidence. We reverse the trial court's order denying that motion, and we remand for proceedings consistent with this opinion.

On September 21, 2011, Officer Joseph McCook of the Philadelphia Police Department was conducting narcotics surveillance on the 3200 block of North Fairhill Street in Philadelphia. On that day, Officer McCook used a confidential informant ("CI") to conduct a controlled narcotics purchase. Officer McCook observed Yong standing in front of a residence located at

3202 Fairhill Street. The CI approached Yong, had a brief conversation with him, and then handed him $120 in pre-recorded currency. Yong passed the money to his codefendant, Samuel Vega, who then entered the residence and later returned with twelve packets of marijuana. Vega then handed the marijuana to the CI.

On September 22, 2011, police conducted surveillance of the same area, but did not observe Yong. The CI purchased twenty-five packets of marijuana, which were similar to the twelve packets that the CI previously had purchased from Yong and Vega. However, the record does not disclose who sold the marijuana to the CI on September 22, 2011. *See* Notes of Testimony Suppression ("N.T.S."), 4/17/2013, at 16 ("[T]here was a transaction. I'm not sure if it was with Vega or not.").

On September 23, 2011, the police continued their narcotics surveillance in the same area. Officer McCook observed Yong and Vega in front of 3202 Fairhill Street. Linwood Fairbanks, an undercover narcotics officer, approached Vega and handed him $40 in pre-recorded currency. Vega then walked over to a nearby vacant lot, retrieved something from the ground, and returned with eight packets of marijuana, which he gave to Officer Fairbanks.

Approximately ten minutes after this transaction, police executed a search warrant on 3202 North Fairhill Street. When police entered the home to execute the search warrant, Yong was standing in the first-floor living room. Without being prompted to do so by any other officer, and without

knowing that other officers had observed Yong's prior drug activity, Officer Gerald Gibson immediately arrested Yong. Officer Gibson discovered a loaded .38 revolver concealed under Yong's waistband.

As a result of these events, Officer McCook filed a criminal complaint charging Yong with various drug and firearm offenses. On September 7, 2012, Yong filed an omnibus pretrial motion seeking to suppress the physical evidence obtained from the search of his person. Therein, Yong argued that Officer Gibson had neither reasonable suspicion to perform a **Terry**[1] frisk, nor probable cause to arrest and search him.

On April 17, 2013, the trial court held a hearing on Yong's motion to suppress. The Commonwealth's sole witness, Officer McCook, testified that he personally observed Yong accept money from the CI on September 21, 2011. Officer McCook further testified that Yong then handed the money to Vega, who gave the CI twelve packets of marijuana. Officer McCook also testified that, throughout his eighteen-year career as a Philadelphia Police Officer, he had observed "hundreds" of narcotics transactions where one participant accepts the money and then hands it off to a co-conspirator. N.T.S. at 12.

---

[1] **See Terry v. Ohio**, 392 U.S. 1 (1968) (holding that police officers may conduct a limited pat-down search for weapons if they reasonably believe that criminal activity is afoot and that the individual is armed and dangerous).

Officer Gibson did not testify at the suppression hearing. Officer McCook testified that he observed Yong participate in what he believed to be a narcotics transaction on September 21, 2011. Officer McCook further testified that Officer Gibson arrested and searched Yong on September 23, 2011 when police executed the search warrant on 3202 North Fairhill Street. While Officer McCook averred that he was present when Officer Gibson recovered the firearm from Yong's waistband, he stated that Officer Gibson arrested Yong "[j]ust as [he] was going inside." *Id.* at 18. Officer McCook explained that "there were six or seven, maybe eight" officers executing the search warrant, and that he was "towards the rear" as they entered the home. N.T.S. at 17. Officer McCook did not testify that he informed Officer Gibson of Yong's role in the narcotics transaction on September 21, 2011, nor did Officer McCook testify that he instructed Officer Gibson to arrest and/or search Yong.

At the conclusion of the hearing, Yong argued that his arrest was unsupported by probable cause because the Commonwealth failed to establish that "anyone spoke to Officer Gibson and told him what they had seen on the 21st." *Id.* at 19. The trial court denied Yong's motion to suppress, reasoning that Officer Gibson possessed sufficient probable cause to arrest Yong because Officer McCook's knowledge could be imputed to all of the officers who were executing the search warrant.

On April 22, 2013, Yong proceeded to a jury trial. On April 24, 2013, the jury found Yong guilty of carrying a firearm without a license and of

conspiracy to commit possession with intent to deliver ("PWID").[2] Because Yong stipulated that he had a prior felony conviction that prohibited him from owning a firearm, the trial court also found Yong guilty of persons not to possess a firearm[3] in a severed proceeding.

By oral motion advanced during his sentencing hearing on June 12, 2013, Yong argued that the jury's guilty verdict on the conspiracy to commit PWID count was against the weight of the evidence. The trial court denied Yong's motion, and sentenced him to five to ten years' imprisonment for persons not to possess a firearm, with concurrent terms of three and one half to seven years' imprisonment for firearms not to be carried without a license and five to ten years' imprisonment for conspiracy to commit PWID.

On July 8, 2013, Yong timely filed a notice of appeal. On July 15, 2013, the trial court directed Yong to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Yong timely complied.

Yong presents two issues for our consideration:

1. Did the trial court err in denying Yong's pretrial motion to suppress the search of his person where the arresting officer had neither probable cause to arrest Yong nor reasonable suspicion to perform a [*Terry*] frisk where Yong was merely present during the execution of a search warrant?

---

[2] 18 Pa.C.S. §§ 6106(a)(1), and 903 (35 P.S. § 780-113(a)(30)), respectively.

[3] 18 Pa.C.S. § 6105(a)(1).

2. Was the evidence insufficient to support Yong's conviction for criminal conspiracy where a veteran police officer wrote in his investigation report that Yong entered one house and then handed a clear bag to a confidential informant[,] but that same officer twice testified that it was [Vega] who went into a different house and handed the same small objects to the same confidential informant?

Brief for Yong at 7 (footnote omitted).

Yong first contends that the trial court erred in denying his motion to suppress the physical evidence obtained from his person. Our standard of review in this context is well-settled:

> In addressing a challenge to a trial court's denial of a suppression motion, we are limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the Commonwealth prevailed in the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

***Commonwealth v. Brown***, 64 A.3d 1101, 1104 (Pa. Super. 2013) (citation omitted). Our scope of review in suppression matters includes only the suppression hearing record, and excludes any evidence elicited at trial. ***See In re L.J.***, 79 A.3d 1073, 1085 (Pa. 2013).

Probable cause to arrest is not mere suspicion or conjecture. The relevant inquiry is "whether the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of

reasonable caution in the belief that the suspect has committed or is committing a crime." ***Commonwealth v. Rodriguez***, 585 A.2d 988, 990 (Pa. 1991).

Yong does not dispute that **Officer McCook's** knowledge that Yong participated in a narcotics transaction two days earlier amounted to sufficient probable cause to justify a warrantless arrest. It was **Officer Gibson**, not Officer McCook, who ultimately arrested Yong. Yong argues that the trial court erred in imputing Officer McCook's knowledge to Officer Gibson.[4] ***See*** N.T.S. at 23 ("[T]he knowledge of one is imputed to all on the scene that day, all the [officers] who are executing the search warrant.").

The Commonwealth maintains that Officer McCook's knowledge of Yong's participation in the earlier drug transaction was imputed to Officer Gibson under the "collective knowledge doctrine." The Commonwealth cites no Pennsylvania case law to support such an expansion of the rule. For the reasons that follow, we conclude that such an interpretation would stretch the doctrine well beyond its stated purpose.

---

[4]    At Yong's suppression hearing, the trial court also reasoned that the police were "entitled" to search everyone inside of the residence because they were executing a valid search warrant. N.T.S. at 22. This is incorrect. We have held that, unless the police obtain an "all persons present" warrant, mere presence during the execution of a search warrant, by itself, is insufficient to justify a search of the person. ***In re J.V.***, 762 A.2d 376, 382 (Pa. Super. 2000).

The collective knowledge doctrine (sometimes called the "fellow-officer rule") was first articulated by then circuit-court judge Warren Burger in *Williams v. United States*, 308 F.2d 326 (D.C. Cir. 1962). There, an appellant argued that his arrest was unconstitutional because the arresting officer lacked "adequate first hand information" amounting to probable cause. The Court rejected this theory, finding that the arresting officer acted based upon the knowledge of another officer within the department who clearly had probable cause to arrest the appellant.

> [I]n a large metropolitan police establishment the collective knowledge of the organization as a whole can be imputed to an individual officer when he is **requested or authorized by superiors** or associates to make an arrest. The whole complex of swift modern communication in a large police department would be a futility if the authority of an individual officer was to be circumscribed by the scope of his first hand knowledge of facts concerning a crime or alleged crime.
>
> When the police department possesses information which would support an arrest without a warrant in the circumstances, the arresting officer, if **acting under orders based on that information**, need not personally or first hand know all the facts. The test, as we have said, is whether a prudent and cautious officer in those circumstances would have reasonable grounds—not proof or actual knowledge—to believe that a crime had been committed and that appellant was the offender.

*Id.* (emphasis added).

In *Whiteley v. Warden*, 401 U.S. 560 (1971), the United States Supreme Court echoed the D.C. Circuit's reasoning. There, a county sheriff received an uncorroborated tip stating that Whiteley and an accomplice had burglarized two local businesses. The sheriff then obtained an arrest

warrant based upon an insufficient showing of probable cause. ***See id.*** at 565 ("Th[e] complaint consists of nothing more than the [sheriff's] conclusion that the individuals named therein perpetrated the offense described in the complaint. The actual basis for [the sheriff's] conclusion was . . . omitted from the complaint."). Following the issuance of the arrest warrant, the sheriff distributed a statewide bulletin via police radio, requesting that any officer who encountered the suspects arrest and extradite them.[5] After hearing the bulletin, a patrol officer in a nearby county arrested the two men and discovered evidence of the burglaries in Whiteley's vehicle.

The ***Whiteley*** Court held that: (1) the sheriff's complaint was insufficient to support the issuance of an arrest warrant; and (2) the informer's tip lacked sufficient indicia of reliability to provide the sheriff with probable cause. Still, the state argued that the arresting officer reasonably relied upon the police radio bulletin and, therefore, had sufficient probable cause to arrest the suspect. The state urged that preventing "officers from acting on the ***assumption*** that fellow officers who call upon them to make an arrest have probable cause for believing the arrestees are [perpetrators]

---

[5] Specifically, the bulletin contained the names and physical descriptions of the two suspects, described the vehicle that they were believed to be traveling in, and stated that an arrest warrant for the two men had been issued. ***Whiteley***, 401 U.S. at 564.

of a crime would . . . unduly hamper law enforcement." *Id.* at 568 (emphasis added).

Justice John Harlan, writing for the majority, rejected this logic.

> We do not, of course, question that the . . . police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.

*Id.* This rule, which later became known as the "collective knowledge doctrine," was a matter of common sense. Had the Court concluded otherwise, the probable cause requirement could be easily circumvented; any officer could simply instruct another officer to make an illegal arrest.

In *United States v. Hensley*, 469 U.S. 221 (1985), the United States Supreme Court again considered the constitutionality of an arrest based upon a law enforcement bulletin. Expounding the collective knowledge doctrine's rationale, the Court explained:

> *Whiteley* supports the proposition that, when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who issued the flyer possessed probable cause to make the arrest. It does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance. In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other

jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction.

*Id.* at 231.

Read jointly, *Whiteley* and *Hensley* instruct that the collective knowledge doctrine serves an agency function. When a police officer instructs or requests another officer to make an arrest, the arresting officer stands in the shoes of the instructing officer and shares in his or her knowledge. In *Commonwealth v. Kenney*, 297 A.2d 794 (Pa. 1972), the Pennsylvania Supreme Court adopted the rationale of *Whiteley*, and upheld a warrantless arrest made by a detective who lacked probable cause, where he acted at the direction of his superior who had specific knowledge of facts and circumstances sufficient to constitute probable cause. Pennsylvania courts have since cited *Whiteley* and *Hensley* for the general proposition that an arresting officer need not possess encyclopedic knowledge of the underlying facts supporting probable cause. Instead, he or she may rely upon an instruction[6] to arrest from another officer who possesses the required knowledge. *See In re D.M.*, 727 A.2d 556, 558 (Pa. 1999); *Commonwealth v. Queen*, 639 A.2d 443, 445 (Pa. 1994);

---

[6] There are no "magic words" that must pass between police officers to invoke the collective knowledge doctrine. The requirement that there be an actual communication between the fellow officers presents only a negligible burden to law enforcement. An officer may issue a conclusory directive to arrest a particular suspect. *See generally* 2 Wayne R. LaFave, Search and Seizure § 3.5 (5th ed. 2012).

- 11 -

*Commonwealth v. Wagner*, 406 A.2d 1026, 1030 (Pa. 1979);

*Commonwealth v. Cotton*, 740 A.2d 258, 262-63 (Pa. Super. 1999);

*Commonwealth v. Fromal*, 572 A.2d 711, 717 (Pa. Super. 1990).[7]

Instantly, there is nothing in the suppression record to suggest that: (1) Officer McCook ordered or directed Officer Gibson to arrest Yong; or (2) Officer Gibson received information justifying Yong's arrest; or (3) Officer Gibson received information, which, coupled with facts that he personally observed, provided probable cause to arrest Yong. This lack of evidence compels the conclusion that Officer Gibson—acting of his own accord—made a warrantless arrest. The fact that, unbeknownst to Officer Gibson, his colleague Officer McCook had observed Yong participate in a drug

---

[7] We are aware of no cases in which the Pennsylvania Supreme Court has departed from or expanded upon the rule announced in *Whiteley*. In *Commonwealth v. Gambit*, a panel of this Court stated that a police officer's knowledge can be imputed to his fellow officer where there "is some communication or connection" between them. 418 A.2d 554, 557 (Pa. Super. 1980). This seems to suggest that the collective knowledge may apply in the absence of a communication, so long as a particular officer is "connected to" an arrest. But, read in context, the inclusion of the word "connection" appears to be an imprecise statement of the law, and not an explicit enlargement of the doctrine. Indeed, the Court in *Gambit* rejected the Commonwealth's argument that relevant information possessed by an officer could be imputed to an arresting officer in the absence of an instruction or directive to arrest. Moreover, in the thirty-five years since *Gambit* was decided, it has never been cited for the proposition that knowledge can be imputed between officers in the absence of a communication between them. Instead, our own Supreme Court has explained that *Whiteley* simply allows an officer to make a warrantless arrest "undertaken at the direction of his superior who had sufficient knowledge of facts and circumstances to constitute probable cause to arrest the defendant." *Commonwealth v. Queen*, 639 A.2d 443, 446 (Pa. 1994).

transaction two days earlier cannot suffice to permit the Commonwealth to leapfrog the Fourth Amendment.

Citing decisions issued by various federal courts, the Commonwealth encourages us to adopt a far more expansive rule. A series of conflicting interpretations of the collective knowledge doctrine have emerged over the last several decades. Some courts have conceptualized the collective knowledge cases as falling into two distinct categories, vertical and horizontal. The "vertical" collective knowledge cases present a straightforward application of **Whiteley** and **Hensley** (*i.e.,* where one law enforcement officer who possesses probable cause instructs a fellow officer to act). As discussed *supra*, Pennsylvania courts have consistently applied this version of the doctrine for several decades, with little controversy.

By contrast, the "horizontal" collective knowledge cases arise when individual law enforcement officers each possess pieces of the probable cause puzzle, but no single police officer possesses information that amounts to probable cause. **United States v. Chavez**, 534 F.3d 1338, 1345 (10th Cir. 2008) (citing **United States v. Shareef**, 100 F.3d 1491, 1503-05 (10th Cir. 1996)). Under this approach, which has never been adopted in Pennsylvania, courts evaluate probable cause by aggregating the knowledge of two or more police officers who are working together on an investigation.

The Commonwealth cites several of these horizontal collective knowledge cases for the general proposition that "the information available to a close group of officers functioning as a team is assessed as a whole."

Brief for Commonwealth at 10. According to the Commonwealth, we must consider the facts within Officer McCook's knowledge in order to determine whether Officer Gibson had probable cause to arrest Yong.

The view that a broader, "horizontal," collective knowledge doctrine exists is far from unanimous. Many courts have declined to enlarge the scope of the doctrine, and will only impute knowledge among fellow officers where there is evidence that the arresting officer acted at the direction of another officer. *See United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011) ("[T]he collective-knowledge doctrine simply directs us to substitute the knowledge of the *instructing officer or officers* for the knowledge of the *acting officer*. . . ." (emphasis in original)); *Haywood v. United States*, 584 A.2d 552, 557 (D.C. 1990) ("An arresting officer need not have firsthand knowledge of the facts giving rise to probable cause *provided that he or she is acting at the suggestion of someone who does."* (emphasis in original)); *United States v. Woods*, 544 F.2d 242 (6th Cir. 1976) (holding that supervising officer's knowledge could not be imputed to arresting officer where the evidence fails to demonstrate that the arrest was based upon supervising officer's order to arrest); *State v. Cooley*, 457 A.2d 352, 356 (Del. 1983) (citing *Gambit*, 418 A.2d 554); *State v. Mickelson*, 526 P.2d 583, 584 (Or. App. 1974) ("A police officer working in a team or in a modern police organization is entitled reasonably to arrest or search on the command or summary information of another officer.").

There does not appear to be a coherent rationale for enlarging the scope of the doctrine beyond the situation where an officer with probable cause directs a fellow officer to make an arrest.[8] Extending the collective knowledge doctrine to apply in the absence of a directive or instruction to arrest issued by an officer who possesses probable cause serves none of the legitimate law enforcement purposes behind the rule. *See Hensley*, 469 U.S. at 231 ("In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction."). Many of the courts that have adopted the horizontal approach to the collective knowledge doctrine have ignored the original aim of the rule—to allow officers to rely upon succinct directives received from a fellow officer. Paradoxically, these courts have expanded the rule, which was intended to encourage communication between police officers while minimizing the volume of information that officers must transmit, by

---

[8] Indeed, some courts have adopted the horizontal collective knowledge approach while purporting to apply the collective knowledge doctrine in its traditional form. *See, e.g., United States v. Verdugo*, 617 F.3d 565 (1st Cir. 2010) (assessing "the collective knowledge of the agents working . . . on [an] investigation.").

eliminating the requirement that officers actually communicate with one another.

The Supreme Court has endorsed the view "that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." **Id.** If there is no 'transmitted information,' a different result obtains. Our law does not permit a police officer to make a warrantless arrest and then later justify it based upon his colleague's knowledge. To adopt the horizontal collective knowledge approach would be to sever the doctrine from its constitutional impetus.

Moreover, an expansive interpretation of the collective knowledge doctrine does not comport with the fundamental requirement that warrantless arrests be supported by probable cause. The benchmark of a warrantless arrest is "whether the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." **Commonwealth v. Rodriguez**, 585 A.2d 988, 990 (Pa. 1991). In the context of probable cause to conduct a warrantless arrest, the United States Supreme Court has explained:

Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

\* \* \*

In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

***Brinegar v. United States***, 338 U.S. 160, 175-76 (1949).

To hold that a warrantless arrest is constitutional where the arresting officer is without direct knowledge or reasonably trustworthy information justifying it would be to ignore the "sensibl[e] . . . conclusions of probability" made by reasonable people. ***Id.*** A reasonable arresting officer cannot reach a sensible conclusion based upon facts that are beyond his or her knowledge. The *post hoc* imputation of knowledge among police officers is an exercise for "legal technicians," not "reasonable and prudent men." ***Id.*** In the absence of any clear authority from the United States Supreme Court, or from our own Supreme Court, we decline to revise this standard.

Even if we were willing to adopt the horizontal collective knowledge doctrine, it would not apply to the facts of the case before us. As the Commonwealth notes, the courts that have accepted this formulation impute knowledge among police officers who are "functioning as a team." Brief for

Commonwealth at 10. However, the horizontal collective knowledge approach also requires "some degree of communication between the officer who possesses the incriminating knowledge and the officer who does not." *United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008); *see also United States v. Parra*, 402 F.3d 752, 766 (7th Cir. 2005) ("Agent Hehr, who arrested Correa, **was in constant communication** with Agent Becka and Agent Chamulak. On this basis, we find the collective knowledge doctrine applicable[.]" (emphasis added)); *United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005) ("We impute information if there has been "**some degree of communication**" between the officers." (emphasis added)); *United States v. Lee*, 962 F.2d 430, 435 (5th Cir. 1992) ("[P]robable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest, when there is '**some degree of communication** between the two.'" (emphasis added)). Instantly, the suppression hearing transcript lacks any testimony that Officer Gibson and Officer McCook communicated with each other. Thus, even the expanded collective knowledge doctrine advocated by the Commonwealth would not preclude suppression based upon the record before us.

Pennsylvania courts have never expanded the doctrine beyond the situation where a police officer who possesses probable cause instructs a fellow officer to act. *See Queen*, 639 A.2d at 446. We decline to adopt the "horizontal" approach to collective knowledge, which some federal courts

- 18 -

have used to aggregate knowledge among police officers functioning as a team. In any event, even if Pennsylvania law recognized such a broad rule, the absence of any evidence that Officers Gibson and McCook actually communicated with one another would render the rule inapplicable to this case.

We understand the trial court's temptation to infer that Officer McCook instructed Officer Gibson to arrest Yong. When a police officer observes a suspect engage in criminal conduct and then a second police officer arrests the suspect, one might reasonably assume that the officers communicated with one another. The testimony presented at Yong's trial suggests that this is what occurred. **See** Notes of Testimony ("N.T."), 4/22/2013, at 68-69 ("When I got in there I wanted to make sure that everybody was patted down, so I told them to pat them down again. And Officer Gibson picked [Yong] up . . . and then he started patting him down."). Nevertheless, as a matter of law, our scope of review in suppression matters is limited to the suppression hearing record, and excludes any evidence elicited at trial. **In re L.J.**, 79 A.3d at 1085.

The result we reach in this case is not a consequence of a hyper-technical legal rule. The collective knowledge doctrine unquestionably authorizes police officers to act upon information or instructions from their fellow officers. **Whiteley**, 401 U.S. at 568; **Hensley**, 469 U.S. at 231. At Yong's suppression hearing, it was the Commonwealth's burden to establish that Officer McCook directed Officer Gibson to arrest Yong. **See**

Pa.R.Crim.P. 581 ("The Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights."). The suppression record before us lacks any evidence to that effect. We are compelled to conclude that Yong's arrest was unconstitutional.

Because we cannot, based upon the state of this record, impute Officer McCook's knowledge that Yong had participated in a prior drug transaction to Officer Gibson, we must conclude that Yong's arrest and the subsequent search of his person were unconstitutional. Accordingly, we reverse the trial court's order denying Yong's motion to suppress.

In his second issue, Yong challenges the sufficiency of the evidence supporting his conviction for criminal conspiracy. Even though Yong's first claim entitles him to relief, we nonetheless are required to address his challenge to the sufficiency of the evidence, because double jeopardy principles would prohibit a retrial on the conspiracy charge in the event that this issue has merit. *Commonwealth v. Palmer*, 751 A.2d 223, 227 (Pa. Super. 2000).

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the

evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier of fact while passing on the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Pappas*, 845 A.2d 829, 835-36 (Pa. Super. 2004) (citation omitted). Additionally, in evaluating this claim, we do not review a diminished record. *Commonwealth v. Smith*, 568 A.2d 600, 603 (Pa. 1989); *Commonwealth v. Parker*, 644 A.2d 1245, 1247 (Pa. Super. 1994). Rather, we are required to consider all of the evidence that was actually received, without consideration as to the admissibility of that evidence or whether the trial court's evidentiary rulings were correct. *Smith* and *Parker*, *supra*.

Section 903 of the Crimes Code provides as follows:

**(a) Definition of conspiracy.**—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. § 903. Once the trier of fact finds that there was an agreement, and that the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act. **See Commonwealth v. Wayne**, 720 A.2d 456, 463-64 (1998).

The essence of a criminal conspiracy, which distinguishes it from accomplice liability, is an agreement between the co-conspirators. **See Commonwealth v. Lambert**, 795 A.2d 1010, 1016 (Pa. Super. 2002). However, "[a]n explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." **Commonwealth v. Johnson**, 719 A.2d 778, 785 (Pa. Super. 1998) (*en banc*) (citations omitted). Therefore, where the conduct of the parties indicates that they were acting in concert with a corrupt purpose, the existence of a criminal conspiracy may properly be inferred. **Commonwealth v. Snyder**, 483 A.2d 933, 942 (Pa. Super. 1984). Non-exclusive circumstances that may establish proof of a conspiracy include: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) participation in the object of the conspiracy. **Commonwealth v. Swerdlow**, 636 A.2d 1173, 1177 (Pa. Super. 1994).

Instantly, there was ample evidence that Yong intentionally aided Vega in selling marijuana. At trial, the Commonwealth presented evidence that,

immediately after Yong accepted currency from the CI, Vega handed the CI twelve packets of marijuana. Two days later, Yong was present when Vega sold marijuana to an undercover officer, and was standing in the living room of the residence when police executed a search warrant. Based upon this evidence, the jury was free to conclude that Yong and Vega had an agreement whereby Yong would screen and accept payment from potential drug purchasers, while Vega would retrieve and dole out the narcotics. **Compare Commonwealth v. Murphy**, 844 A.2d 1228 (Pa. 2004) (finding sufficient evidence to support conviction for conspiracy to commit PWID where appellant asked undercover officer if he was a "cop," and then introduced him to his co-conspirator who sold the officer heroin). Accordingly, Yong's challenge to the sufficiency of the evidence is without merit.[9]

_____

[9] In arguing that the evidence adduced at trial was "insufficient in both volume and quality," Yong appears to conflate his challenge to the sufficiency of the evidence with a challenge to the weight of the evidence. Brief for Yong at 22. The sum of Yong's sufficiency argument is that the evidence was insufficient because Officer McCook's investigation report was inconsistent with his later testimony at trial. This argument challenges the credibility of the Commonwealth's witness and, therefore, implicates the weight of the evidence—a claim that Yong has failed to preserve for our review. **See** Statement of Errors Complained of on Appeal, 8/1/2013, at 1 ("[The trial c]ourt erred by denying [Yong's] post-verdict motion for a judgment of acquittal where [Yong] argued that there was **insufficient** evidence." (emphasis added)). Accordingly, Yong has waived his challenge to the weight of the evidence. Pa.R.A.P. 1925(b)(4)(vi) ("Issues not included in the [1925(b) statement] . . . are waived."); **see generally Commonwealth v. Lord**, 719 A.2d 306 (Pa. 1998).

For the foregoing reasons, we vacate Yong's judgment of sentence, reverse the trial court's order denying Yong's motion to suppress, and remand for retrial.

Judgment of sentence vacated. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judge Panella joins the opinion.

Judge Lazarus files a concurring statement.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/16/2015